**UNITED STATES of America,
Plaintiff,**

v.

**STANDARD OIL COMPANY (New Jersey) and Esso Export Corporation,
Defendants.**

( United States District Court
S. D. New York.
Dec. 14, 1955.

**348**

John D. Roeder, Executive Assistant to the U. S. Atty., New York City, Richard B. O'Donnell, Dept. of Justice, New York City, Milo V. Olson, Sp. Asst. to the Atty. Gen., for plaintiff.

Sullivan & Cromwell, New York City, for defendant Esso Export Corp. Bruce Bromley, New York City, of counsel.

Association of the Bar of the City of New York, amicus curiae. Paxton Blair, New York City, of counsel.

New York County Lawyers' Association, amicus curiae. George Trosk, New York City, sp. counsel, W. Randolph Montgomery, William M. Kaplan, Frederick F. Rehberger, New York City, of counsel.

Bethuel M. Webster, New York City, amicus curiae.

IRVING R. KAUFMAN, District Judge.

In a civil suit by the United States Government to recover refunds from Standard Oil Company (New Jersey) and its subsidiary, Esso Export Corporation, for alleged overcharges in ECA financed transactions, defendant Esso Export moved for an order decreeing that the law firm of Sullivan & Cromwell, its counsel, may properly represent Esso Export in this action, and the government cross-moved for an order disqualifying Sullivan & Cromwell from acting as attorneys for defendant in this suit. The basis for the motion and cross-motion was a request made by the Department of Justice on June 2, 1955 that Sullivan & Cromwell withdraw as attorneys because one of their partners, Mr. Garfield Horn, who is actively working on the case, was a government counsel for a Paris office of the Economic Cooperation Administration (ECA) during the period in question. The government contends that Mr. Horn and his firm are barred from participation in this suit by Canons 6, 36 and 37 of the Canons of Legal Ethics adopted as Rules of this Court.[1] Succinctly stated, these Canons forbid an attorney to accept employment in matters adversely affecting any interest of a former client with respect to which confidence has been reposed. They forbid his revealing or using such confidences to the disadvantage of the former client even though there are other available sources of this information. Further, they forbid a former government attorney to accept employment "in connection with any matter which he has investigated or passed upon while in such office or employ." Canon 36. In order to intelligently decide whether Mr. Horn and his firm have in fact violated these Canons, a thorough understanding of the factual and legal questions posed by the main controversy is necessary.

1. Rules of the United States District Court for the Southern District of New York, General Rule 5(c).

## The Main Action

In the main action, the United States seeks recovery of $35,862,288.08 claiming that Esso Export charged excessive prices in sales of Arabian crude oil to private importers in European countries participating in the Marshall Plan. Under this plan, authorized by the Economic Cooperation Act of 1948, 22 U.S.C.A. § 1501, et seq., the ECA allocated funds in United States currency to various European nations participating in the program through the issuance of "procurement authorizations" setting forth the conditions for procurement of commodities. Firms in participating countries which desired crude oil, for example, after obtaining the approval of their respective governments, contracted to purchase such crude oil from various suppliers (including Esso Export). Such purchasers made payment to their local governments in local currencies and the money so paid was placed in "counterpart fund" accounts for use locally in connection with foreign aid programs. The suppliers were paid in the United States currency allocated by ECA, payment being made either through the participating countries or through designated banks in accordance with the type of procurement authorization which had been issued. Thus although the money was not paid directly by ECA to the suppliers, suppliers were paid in money provided by the United States; the local moneys paid out by the importers were retained in their respective countries for ECA approved projects aimed at the economic rehabilitation of Europe.

With regard to the specific transactions which are the subject matter of this suit, the United States claims that the prices charged by Esso Export for Arabian crude oil were higher than the maximum prices permitted by the Act and by the ECA Regulations which were promulgated [purportedly] pursuant to the Act. The government claims that these price maximums were the allegedly lower prices charged by Esso Export and other companies in comparable sales not financed by ECA and in shipments of Arabian crude oil to Western Hemisphere destinations.[2] The period in question dates from April 3, 1948, effective date of the Economic Cooperation Act of 1948, until August 1952, the month of the commencement of this law suit and of the last shipment of Arabian oil in any ECA transactions.

Defendant, Esso Export, in its answer, denied any violation either of the price provisions of the Act or of the ECA regulations promulgated under them, assuming these to be valid. Defendant further contended that these Regulations are invalid.[3] For an affirmative defense, the defendant alleged that the United States continued to reimburse participating countries with respect to these purchases of Arabian crude oil although it had full knowledge of all data material to applying the price maximums of the Act and Regulations to the prices Esso Export charged for such crude oil. It alleged further that by the government's failure to notify defendant that the prices charged were considered excessive, it represented to the defendant that the prices charged were not in excess of maximum prices, and that the government knew or should have known that the defendant would rely on this representation by continuing to sell crude oil at those

2. The maximum prices were not set prices, but had to be calculated from certain economic data; basically, the prices were not to exceed the prices charged in comparable non-ECA sales. The statutory maximum is set forth in 22 U.S.C.A. § 1510(l); the applicable maximums set by Regulation can be found in 14 Fed. Reg. 2166, Regulation 1, Sec. 201.22(e)(2), and were inserted therein by the Administrator by amendment to Regulation 1 dated May 3, 1949.

3. Defendant questions whether the rulemaking authority given to the Administrator by Section 104(f) of the ECA Act, 22 U.S.C.A. § 1503(f), extended to setting such price maximums. Barnes affidavit, September 8, 1955, p. 82. (All page references for affidavits and arguments refer to the printed record submitted, not the original typewritten documents.)

prices. In good faith, defendant alleged, it did rely on such representation, and it pleaded estoppel against the government. Another defense averred that under the Marshall Plan, for each dollar of assistance provided by the United States to a participating country, that country deposited an amount of its local currency commensurate to the United States dollar cost in counterpart funds. Defendant asserted that since these funds were expended for various economic rehabilitation projects consistent with the purposes of the Act, and therefore with the purposes of the United States, the government has had full benefit of the moneys it expended and has sustained no damages.

It is against this background of the case that we must examine the government service and private employment record of Mr. Garfield Horn, the partner in Sullivan & Cromwell whose former employment by ECA is the cause of these motions.[4]

### Mr. Horn's Employment Record

Mr. Horn joined the staff of Sullivan & Cromwell as a salaried associate upon his graduation from Harvard Law School in 1946. A major part of his work for the firm was in the area of foreign legal and economic problems, an area of work for which he had specially prepared during his undergraduate training. In April 1949, Mr. Horn completely terminated his relationship with Sullivan & Cromwell, and on May 31, 1949, he entered the employ of ECA. At the time he left the employ of Sullivan & Cromwell there was no understanding with respect to his being re-employed by the firm; rather he was clearly told that any application for re-employment would have to be considered anew on the basis of the situation at the time such application was made. Mr. Horn served with the ECA until October 11, 1951, and in November 1951, he again entered the employ of Sullivan & Cromwell, pursuant to arrangements made during the summer of 1951, and he became a partner of the firm on January 1, 1953. Since his return to the firm, he has continued to concentrate on problems with foreign aspects. In the spring of 1952, Sullivan & Cromwell was retained to represent Esso Export in this case; the retainer came personally to Arthur H. Dean, senior partner of the firm, who is also quite familiar with aspects of the Marshall Plan and related problems. Since Mr. Horn had often worked under Mr. Dean in such matters before, Mr. Dean chose Mr. Horn to act as his assistant in this case. Mr. Horn assured Mr. Dean at that time that while in ECA he had never worked on the subject of the present controversy, that he had never investigated or passed upon it, and that in all respects the matter was completely new to him, and 'he had never heard of it while he was with ECA.

■ The government has been aware of Mr. Horn's active participation in the case since the fall of 1952, but not until June 2, 1955 did it make a request for Mr. Horn's and his firm's withdrawal.[5]

4. It is conceded by Sullivan & Cromwell that if Mr. Horn is disqualified, the entire firm is disqualified. The reasons for this will be discussed *infra* in relation to the theory of imputed knowledge within a partnership. Even without this theory, if he is disqualified so is his work product which would be difficult to distinguish from that of the rest of the firm.

5. Mr. Isaac N. P. Stokes, who was an official of ECA from January 24, 1949 through July 25, 1953, was General Counsel of ECA when this suit was brought. He had served with the Office of the Special Representative of ECA in Paris both in the General Counsel's Office where Mr. Horn was employed and as Special Assistant to the Deputy Special Representative from the start of his ECA career until July, 1952, When he became ECA General Counsel, he learned of Mr. Horn's connection with this case, considered whether he should raise any question about this and decided it was unnecessary to do so. He avers:

"This conclusion was based on the fact that, based on my familiarity with the operations of GC/Paris * * * I had no reason to believe that Mr. Horn could have had anything to do with the subject matter of the case during his

The government contends that it was not until Mr. Horn displayed "peculiar knowledge" of the inner workings of ECA during a conference in March of 1955 that it considered whether there might be any impropriety in his serving as attorney for defendant and that an investigation then of Mr. Horn's government service record convinced it that a request for withdrawal was necessary.[6]

During the entire two and a half years Mr. Horn served with the ECA he was in the General Counsel's Office of the Office of the Special Representative in Paris (OSR/Paris). The only periods during which he was in Washington were ten days of personnel processing and indoctrination at the time of his initial assignment to Paris, approximately two days personnel processing at the termination of his duties, and two trips to Washington on OSR/Paris business. He was initially hired as an Attorney and served in that capacity until February, 1950 when he was promoted to Assistant General Counsel, a position he held for eight months.[7] On October 15, 1950 he was appointed Deputy General Counsel, having served during one or two periods in the interim as Acting General Counsel of OSR. He continued to be Acting General Counsel of OSR from October 15, 1950 until January 21, 1951, when he was appointed General Counsel of OSR/Paris, a position he retained until his resignation in October 1951. I reiterate; all these positions were held in Paris. The General Counsel of OSR/Paris was chief legal representative and adviser of the United States Special Representative in Europe. The Special Representative, holding the rank of Ambassador, was the representative in Europe of the Administrator of the Economic Cooperation Act.[8]

### Respective Interpretations of Mr. Horn's Government Service Record

Mr. Horn's period of service with ECA from May 1949 to October 1951 falls entirely within the period of time during which the contested transactions occurred, i. e., April 1948 to August 1952. His position in the OSR/Paris hierarchy was an important one. Nevertheless, defendant contends that due to a division in functions between ECA/Washington and OSR/Paris, Mr. Horn's office in OSR/Paris knew nothing of the subject

employment by ECA and, in addition, on my complete confidence in Mr. Horn's integrity and good judgment." Stokes affidavit, September 26, 1955, pp. 256–7.

6. Attorney for the defense has raised the question of laches here because of this two and a half year interval during which the government maintained silence though it knew of Mr. Horn's former employment and present connection with this case. Since a court may disqualify an attorney on its own motion for violation of the Canons of Ethics, see Porter v. Huber, D.C.W.D.Wash.1946, 68 F.Supp. 132, the government's laches, if any, cannot prevent an adjudication of this question once a possible violation of the Canons has been called to the court's attention. Here a former key legal official of ECA in Paris is representing defendant against ECA in a suit based on transactions occurring during his tenure in office. To state the case is to raise the ethical question. Those cases which have barred the raising of the ethical question for the first time on appeal, after complainant with full knowledge has kept silent during the trial, are not applicable here. Moreover, such holdings are analogous to the doctrine of waiver of complainant's privilege, and there can be no such waiver where the public interest is involved.

7. The difference between these two positions during Mr. Horn's tenure was largely one of salary. The Assistants received a higher salary and were generally assigned to work of greater importance than were the Attorneys. As an Assistant, Mr. Horn had no supervisory functions. Horn affidavit, November 22, 1955.

8. The Special Representative was also the chief representative of the United States Government to the Organization for European Economic Cooperation (OEEC), and was coordinator of the activities of the Chiefs of the special ECA Missions established in each of the European countries participating in the European Recovery Program in accordance with the Economic Cooperation Act. Katz affidavit, September 24, 1955, p. 248.

matter of these transactions, and none of his work for OSR/Paris was related to the subject of this case.

Defendant contends that OSR/Paris was concerned with implementing the operating phases of the ECA program, that its function in chief was to work closely with the various European countries and the ECA Missions in them on problems such as eliminating trade restrictions between the participating countries, clearing European payments and working out foreign currency problems, the allocation of scarce materials, and problems of manpower supply. It claims that the General Counsel's Office furnished legal advice on such problems, its chief job being the determination of whether various activities could be undertaken under the terms of the Act or financed with counterpart funds. Defendant further asserts that the only petroleum problems considered by OSR/Paris were those that dealt with the compiling of data estimating the oil requirements of the various countries, and recommending where and how much additional refinery capacity should be built in Europe. It is defendant's contention that ECA/Washington had exclusive responsibility for the drafting, promulgation and enforcement of the ECA policies relating to procurement and prices set forth in ECA Regulation 1, the Regulation which implemented the Marshall Plan procurement program. Defendant further says that this sharp division in functions between ECA/Washington and OSR/Paris also applied to the two separate General Counsel's Offices; that while the General Counsel's Office in Washington played an active part in the drafting, promulgation and enforcement of the procurement and price provisions of Regulation 1, the General Counsel's Office in Paris played no role in these matters, and that as to the very contro-

versy on which the lawsuit is based, the General Counsel in Washington was continuously involved in the controversy while the Paris office played no part in it. The defendant urges, therefore, that Mr. Horn never received any confidences of the government with regard to the subject matter of this case; that he cannot be considered as having represented the government in matters relating to this case; that he never investigated or passed upon the matters involved in this controversy; and that he is, therefore, free to act as attorney for defendant, Esso Export.

The government's reply to defendant's contentions is largely based on the key legal position Mr. Horn held during the time of the transactions in question. It urges that his duties in Paris included proposing legislation necessary to implement the operating phases of the program, solving legal problems arising under the Act, interpreting legislative provisions under the Act and drafting new legislative provisions. The government contends, therefore, that while Mr. Horn was employed by the government, he should have pointed out any invalidity in Regulation 1 which defendant now asserts. It is the government's position that whether or not Mr. Horn ever actually considered the validity of Regulation 1, he is disqualified because he should have done so.[9] Further, it claims that he actually did pass on Regulation 1 and pricing problems under it, more specifically, petroleum pricing problems.

It is urged further by the government that Mr. Horn had access to confidential data relating to the present controversy, and that in connection with the broad estoppel defense urged by defendant, many of the matters which must necessarily have come to Mr. Horn's attention while he was counsel and General

9. The language of Canon 36 bars a former government attorney from accepting employment in connection with any matter "which he has investigated or passed upon while in such office or employ." The government contends that this includes matters which "he should have

passed upon." This is a novel contention and the government cites no case to support it. The possible application of such a theory and its limitations, if applied, will be considered in discussing the appearance of evil, infra.

Counsel in Paris, and because of his official position, are closely related to and interwoven with the question of the government's knowledge of the purported overcharges. It points out that many of his duties related to the counterpart funds mentioned in defendant's answer as having been expended for the benefit of the United States thus nullifying the government's claim of damages, and asserts that this fact also disqualifies him. The government summarizes its position by asserting that Mr. Horn is disqualified from acting in this case by Canons 6 and 37 because he had access to and obtained confidential information from the plaintiff and because he owed a duty of fidelity to plaintiff; and that he is further disqualified by Canon 36 because he passed upon or should have passed upon matters relating to the present controversy.

It is obvious, therefore, that the extent, if any, of Mr. Horn's involvement in matters related to the present case is in sharp conflict. The legal consequences of any relationship found will depend, of course, on the pertinent Canons of Ethics as interpreted by the courts and various bar association committees on professional ethics which have dealt with these Canons.

### The Canons of Ethics Involved

The pertinent provisions of these Canons follow:

*Canon 6. Adverse Influences and Conflicting Interests*

" * * * *

The obligation to represent the client with undivided fidelity and not to divulge his secrets or confidences forbids also the subsequent acceptance of retainers or employment from others in matters adversely affecting any interest of the client with respect to which confidence has been reposed."

*Canon 37. Confidences of a Client*

"It is the duty of a lawyer to pre-

serve his client's confidences. This duty outlasts the lawyer's employment, and extends as well to his employees; and neither of them should accept employment which involves or may involve the disclosure or use of these confidences, either for the private advantage of the lawyer or his employees or to the disadvantage of the client, without his knowledge and consent, and even though there are other available sources of such information. A lawyer should not continue employment when he discovers that this obligation prevents the performance of his full duty to his former or to his new client.
* * * * "

*Canon 36. Retirement from Judicial Position or Public Employment*

" * * * * *

A lawyer, having once held public office or having been in the public employ, should not after his retirement accept employment in connection with any matter which he has investigated or passed upon while in such office or employ."

### Inferences Arising Under the Canons

Decisions interpreting these Canons have created three inferences operating against the attorney in question which the government contends are operative here. These must be examined to determine if they are applicable in the present case.

**I. Inference of Access to Confidential Information**

██ Insofar as these canons relate to the question of preservation of a former client's confidences, they disqualify an attorney who has received confidences which might possibly be relevant to the controversy at hand as they seek to avoid unconscious as well as conscious betrayal.[10]

10. "It would be unjust to the bar as a whole and to the litigants appearing before our courts to place advocates in a

position where, even unconsciously, they might take, in the interests of a new client, an advantage derived or traceable

As to who must carry the burden of showing that relevant confidences were reposed, an inference favorable to complainant has been reaffirmed recently in this Circuit. In T. C. Theatre Corp. v. Warner Bros. Pictures, Inc., D.C.S.D. N.Y.1953, 113 F.Supp. 265, 268, Judge Weinfeld said:

"A lawyer's duty of absolute loyalty to his client's interests does not end with his retainer. He is enjoined for all time, except as he may be released by law, from disclosing matters revealed to him by reason of the confidential relationship. Related to this principle is the rule that where any substantial relationship can be shown between the subject matter of a former representation and that of a subsequent adverse representation, the latter will be prohibited."

The court disagreed with the contention of the attorney whose conduct was questioned in the T. C. Theatre case. The attorney urged that the former client was required to show that it had disclosed to the attorney confidential matters related to the instant case. The court stated:

"[T]he former client need show no more than that the matters embraced within the pending suit wherein his former attorney appears on behalf of his adversary are *substantially related* to the matters or cause of action wherein the attorney previously represented him, the former client. *The Court will assume that during the course of the for-*

mer representation confidences were disclosed to the attorney bearing on the subject matter of the representation." (Italics supplied.) at page 268.

In Consolidated Theatres, Inc., v. Warner Bros. Circuit Management Corporation, 2 Cir., 1954, 216 F.2d 920, the Court of Appeals for the Second Circuit adopted Judge Weinfeld's reasoning as related to the issue of burden of proof of disqualification under the Canons of Ethics. In that case there were no findings—and perhaps no evidence—of specific information given by the former client to the attorney, the use of which would adversely affect the former client in the instant suit. The Court said:

"[T]here is no suggestion in the Canons that to invoke an obligation defined therein the proof thereof must be by *direct* evidence. We think that the professional obligation therein defined, like any legal relationship, may be established *by reasonable inference*." (Second emphasis supplied.) at page 924.

 The rule is clear, therefore, that complainant's burden extends only to showing the existence of a substantial relationship between the subject matter of the lawsuit and the matters in which the attorney represented his former client. This substantial relationship creates an inference that confidential information was reposed. Further, complainant need only show *access* to such *substantially related* material and the inference that defendant received these confidences will follow.[11]

---

to, confidences reposed under the cloak of a prior, privileged, relationship." Watson v. Watson, Sup.Ct.1939, 171 Misc. 175, 11 N.Y.S.2d 537, 540. See Consolidated Theatres, Inc., v. Warner Bros. Circuit Management Corp., 2 Cir., 1954, 216 F.2d 920, 925; Brown v. Miller, 1923, 52 App.D.C. 330, 286 F. 994; T. C. & Theatre Corp. v. Warner Bros. Pictures, Inc., D.C.S.D.N.Y.1953, 113 F.Supp. 265, 269; American Bar Association, Committee on Professional Ethics and Grievances, Opinions #83 and 177 (hereafter cited as A.B.A. Opinion # ——); Association of the Bar of the City of New

York, Committee on Professional Ethics, Opinions #2 and B–39 (hereafter cited as City Opinion # ——).

Where it is clear that betrayal of confidences can be avoided, however, it is permissible for an attorney to take a case adverse to the interests of a former client. See City Opinions #87, 119, 383, 508, B–26, B–32, B–172.

11. The reason for the access extension to this rule is that there might be a situation where the client does not consult orally with the particular attorney (*e. g.*, if the attorney is a junior attorney assigned to the case); nevertheless,

■■ The rationale behind this rule is as sound as it is elementary. The confidences communicated by a client to his attorney must remain inviolate for all time if the public is to have reverence for the law and confidence in its guardians. It is traditional in the legal profession that the fidelity of a lawyer to his client can be depended upon. The client must be secure in his belief that the lawyer will be forever barred from disclosing confidences reposed in him. It follows that if, in order to protect his secret utterances to counsel, the client or former client is required to reveal these utterances, the very purpose of the rule of secrecy will be destroyed, and the free flow of information from client to attorney, so vital to our system of justice, will be irreparably damaged. Therefore, to guarantee that these confidences remain inviolate, the courts will assume that when a client entrusts an attorney with the handling of a particular matter, the client will reveal to that counsel all the information at his disposal, including confidential matter. It is upon this assumption that the courts will bar an attorney from taking a position adverse to a former client in regard to any matters substantially related to those in which the attorney represented that client. This assumption, however, is reasonable only so long as there is a substantial relationship between those former matters and the lawsuit in which the confidence question is raised.

### A. Substantial Relationship of Subject Matter

Unfortunately, the cases furnish no applicable guide as to what creates a "substantial" relationship. In both of the cited cases, the attorney in question had served as defense counsel for motion picture producers in anti-trust actions brought by the United States government charging defendants with a nationwide conspiracy in violation of Sections 1 and 2 of the Sherman Act, 15 U.S.C.A. §§ 1, 2. They were later retained by independent exhibitors as counsel for plaintiffs in treble damage actions against these producers alleging the same type of conspiracy in violation of the Sherman Act. The evidence disclosed that the attorneys in question had had access to the files of their former clients which showed in detail their clients' *modus operandi*, and that they had made extensive use of these files in preparing a defense against the government. The relationship between the first anti-trust litigation and the second case was in each instance patently clear; indeed, the finding of a nation-wide conspiracy in the government's case was *prima facie* proof of a conspiracy in the later private actions.[12] No such glaringly obvious relationship exists in this case.

Guidance on this point cannot be found either in those other decisions by courts or Ethics Committees which have dealt with the problem of representing adverse interests and the question of confidence betrayal raised thereby. In the majority of the cases decided by both bench and bar committees on the question of representing interests adverse to a former client, the offending attorney had either accepted a retainer from the other side in a retrial of the same case in which he

---

records, files and other materials substantially related to the controversy at hand are made available to that attorney by the client. The attorney thus has access to the various documents, and the assumption is that these were made available to him only because of the confidential nature of the attorney-client relationship.

The question of whether this inference follows from access alone where there is no proof of use by the attorney of the materials in question will be discussed

*infra* under the headnotes dealing with government attorneys.

12. Clayton Act § 5, 38 Stat. 731, 15 U.S. C.A. § 16.

The activities of another attorney similarly involved in such a motion picture anti-trust suit gave rise to several suits involving disqualification of himself and his partners. See Fisher Studio, Inc. *v.* Loew's, Inc., 1954 Trade Cases, p. 69,-335 (E.D.N.Y.1954); Laskey Bros. of W. Va. Inc., *v.* Warner Bros. Pictures, Inc., D.C.S.D.N.Y., 130 F.Supp. 514, affirmed,

had formerly represented complainant, **or** he had taken a position adverse to the former client in a matter in which he had specifically represented him.[13] In most of these cases, the link between the subject matter of the first litigation or first representation by offending counsel, and the second, adverse litigation was comparatively simple to detect—the same accident,[14] the same documents,[15] the same litigation,[16] etc.[17]

There appears to be no case where the question of whether a substantial relationship existed between the former representation and the second suit presented serious factual problems. But, clearly, the word "substantial" must be given some restrictive content.[18]

## B. Defendant's Contention: No Substantial Relationship

In the present case, Mr. Horn was formerly employed in a Paris office of the

---

2 Cir., 1955, 224 F.2d 824. The attorney himself was disqualified upon findings similar to those in the T. C. Theatre and Consolidated cases; the question of his partners' positions will be discussed *infra*.

13. The above-mentioned motion picture anti-trust cases represent the most complex factual questions as to substantial relationship which the courts have been called upon to decide; in the other major cases there was a very close and unassailable connection between the attorney's former employment and the subject matter of the pending litigation. *E. g.*, General Contract Purchase Corp. v. Armour, 5 Cir., 1942, 125 F.2d 147 (Attorney who defended client in a criminal proceeding, cannot now sue him in civil suit based on same accident); United States v. Bishop, 6 Cir., 1937, 90 F.2d 65 (Former government attorney cannot now take opposite side in retrial of same suit in which he had formerly represented the government); Brown v. Miller, 1923, 52 App.D.C. 330, 286 F. 944 (Former attorney for the Alien Property Custodian cannot represent claimant of company whose affairs he handled for the Custodian where the claim is mal-administration by the Custodian); Thatcher v. United States, 6 Cir., 1914, 212 F. 801 (Attorney cannot accept professional employment to attack legal arrangement he himself had set up); In re Boone, C.C.N.D.Cal.1897, 83 F. 944 (Attorney who defended petitioner's patents in several suits cannot now offer services to those attacking the same patents in other suits); United States v. Costen, C.C.D.Col.1889, 38 F. 24 (Attorney who served one side in a case, cannot after termination of his employment, offer to serve the other side in the same suit); Porter v. Huber, D.C.W.D.Wash. 1946, 68 F.Supp. 132 (Attorneys who worked for plaintiff OPA when refund suit was pending, and who did some work on the pending case, cannot now act as attorneys for defendant).

14. See Michel v. McKenna, 1929, 199 Wis. 608, 227 N.W. 396; A. B. A. Opinions #135, 247.

15. See Sheffield v. State Bar of California, 1943, 22 Cal.2d 627, 140 P.2d 376; Federal Trust Co. v. Damron, 1933, 124 Neb. 655, 247 N.W. 589; A. B. A. Opinion #177; City Opinion #32. Cf. City Opinion #715.

16. See In re Maltby, 1949, 68 Ariz. 153, 202 P.2d 902; Bowman v. Bowman, 1899, 153 Ind. 498, 55 N.E. 422; In re Themelis, 1951, 117 Vt. 19, 83 A.2d 507; A. B. A. Opinion #83; City Opinion #B–19.

17. See Anderson v. Eaton, 1930, 211 Cal. 113, 293 P. 788 (Attorney cannot represent conflicting interests arising from the same transaction); People v. Gerold, 1914, 265 Ill. 448, 107 N.E. 165 (Attorney who had represented X in matters dealing with his term in office cannot now prosecute X when these same matters are involved); Watson v. Watson, 1939, 171 Misc. 175, 11 N.Y.S.2d 537 (Attorney who had represented defendant in criminal action against him cannot now represent defendant's wife in annulment action based on his former bad character); Pierce v. Palmer, 1910, 31 R.I. 432, 77 A. 201 (Attorney who represented executor of estate cannot now represent legatees in suit against executor). See also A. B. A. Opinions #33, 39, 49; City Opinions # 42, B–39; New York County Lawyers' Association, Committee on Professional Ethics, Opinion #157 (hereafter cited as County Opinion # ——).

18. The necessity for requiring a substantial relationship before assuming that confidences were reposed is particularly acute where the personal integrity of the attorney in question has not been challenged—*i. e.*, where complainant bases its case on an inadvertent betrayal so far as the issue of confidences is concerned, as is the case here.

very agency which is making a claim against his client. His job was concerned with legal questions arising during the implementation in Europe of the operating phases of the ECA program, the program under which the contested transactions occurred. However, ECA was a vast agency with a network of offices throughout Europe and in Washington, D. C. It administered a billion dollar foreign aid program which dealt with almost every sort of problem that could arise in financing a project aimed at helping Europe recover from the devastations of World War II. It is easy to visualize a situation where an official in one office of that agency would be unaware of some of the functions of other branches of the agency. Indeed, this is the very contention that defendant makes here. It claims that the job of implementing the operating phases of the program in no way involved consideration of any pricing, procurement or refund problems of the type involved in the present controversy. Defendant supports its assertion that Mr. Horn's former duties had nothing to do with any matters relating to the present controversy by the affidavits of 13 men who held key positions in ECA in Paris and in Washington during the period in question. Typical of their recollections is the affidavit of Isaac N. P. Stokes, who served as Acting General Counsel, General Counsel and Acting Special Representative in OSR/Paris from February 1949 through September 1952, at which time he became General Counsel in Washington, a position in which he served until March 1953. In his affidavit of September 26, 1955, he states:

> "In connection with the preparation of this affidavit, I have carefully searched my recollection as to all aspects of this case of which I had any knowledge and as to the functions, responsibilities, and activities of GC/Paris. I am unable to recall any instance in which there was

referred to or considered by GC/-Paris any question relating to the promulgation, interpretation, operation, or validity of any of the pricing or refund provisions of ECA Regulation 1, either in connection with Arabian crude oil or any other commodity; any question involving the consideration of whether prices charged in ECA-financed sales of Arabian crude oil complied or failed to comply with the provisions of ECA Regulation 1; any question concerning prices charged for Arabian crude oil, whether in ECA-financed sales or non-ECA-financed sales; any question involving comparisons between prices of Arabian crude oil shipped to European destinations and prices of Arabian crude oil shipped to Western Hemisphere or other destinations; or any question concerning refunds to be obtained in respect of ECA-financed shipments of Arabian crude oil. Nor can I recall any other instance in which GC/Paris would have had any occasion to acquire any information regarding any of the above-mentioned questions, or any instance when or any reason why any member of the staff of GC/Paris would have had any occasion, on his own initiative, to inquire into the subject matter of this case.

> "Any reference of any such questions to GC/Paris or to any other part of OSR/Paris would have been inconsistent with the recognized division of responsibilities and functions as between Washington and Paris." [19]

I find that these affidavits establish that there was no such substantial relationship between Mr. Horn's former work and his present position as would disqualify him in this suit. Any other ruling would delete all meaning from the word "substantial." [20] These affidavits

19. Stokes affidavit, September 26, 1955, pp. 257–258.

20. In thus holding, I reject the government's claim that the affidavits are distinguishable and that they are not inconsistent with the government's position. The government's attempted dis-

deprive of any significance the fact that Horn had access to the file rooms of OSR/Paris by their assertion that the functions of that office were such that it would not maintain relevant files.[21]

## C. Rebutting Defendant's Affidavits Re: No Substantial Relationship

The government had two alternative methods of rebutting the import of these affidavits:

(1) It could show that no such functional division actually existed, and that substantially related affairs were handled by Paris, thereby raising the inference of access to substantially related material.

(2) If it could not disprove the existence of the functional split, it could show that despite this division, Mr. Horn did actually work on matters substantially related to the present controversy.

The government has attempted to pursue both courses by submitting a series of documents with which Mr. Horn had some contact while working for OSR and which, it claims, show that he actually did work on or have access to documents on matters substantially related to the present controversy, and that he received confidences relevant to the present case. By choosing to rest its case on specific documents, however, the government has withdrawn itself in part from the sphere of the access-substantial relationship-confidence inference. If any of these documents tends to show that Mr. Horn's job did actually bring him into contact with relevant confidences or substantially related affairs generally, the government will have carried its point—not by inference but by direct proof.[22] If none of the documents is itself indicative of such a connection be-

---

tinction is based on the fact that these affidavits were made by persons who severed their connection with ECA before the end of 1952, and that:

"The subject matter of the oil litigation as it was then understood to exist in 1952 and prior thereto is not the same as matters substantially related to the issues of this case as created by the affirmative defenses pleaded in defendant Esso's answer, filed on May 12, 1953.
* * * *
[T]he test should be whether Mr. Horn had access to, investigated, or passed upon matters substantially related to or closely interwoven with the issues in the case, as they *now* appear to the Court." (Oral argument submitted in printed form, pp. 40–41.)

This argument disregards the fact that these affidavits were all made on September 22, 1955 and thereafter by intelligent persons who were aware of the purpose to which they would be put, and who, it must be assumed, made these affidavits in light of the case as it then appeared.

21. In his affidavit of September 26, 1955, Mr. Horn avers (pp. 188 and 225) that he never consulted or had access to any files other than the files of the General Counsel's Office of OSR/Paris during his tenure in the department, and he further avers that he never consulted the oil folders of the files in the General Counsel's Office. He states that he never had access to or consulted any of the

files of the General Counsel's Office in Washington or any other government file in Washington, and avers the same with respect to the files of the various ECA Missions. The question of whether, because of Mr. Horn's key position and the frailty of human memory, access might nevertheless be inferred to the various files throughout the OSR/Paris office will be discussed *infra*, but it must be assumed that he would remember consulting files in Washington, D. C., if he ever did so.

22. It should be noted that two of the reasons for this access-substantial relationship-confidence inference which were mentioned in the Consolidated case are lacking here: (a) In that case, the complainant did not want to show the court what the particular confidences reposed were; he wanted his privacy as to those matters protected. Here the government has produced for court scrutiny many of the claimed confidential papers. (b) In that case, there was no showing that particular matters were revealed to the former attorney in a confidential manner. Here, the government has produced many documents which are classified so that the presumption of confidence is unnecessary.

On this motion, neither side has requested a hearing, nor was one necessary. The government has been content to rest its case on specific documents. The defendant rests its case on affidavits based upon the knowledge of the affiants

tween his former job and the present lawsuit, the government will not have sustained its burden of showing substantial relationship in light of the affidavit evidence of a division in functions, and the inference flowing from such a relationship will not be applicable. Only if these documents fail to show action by Mr. Horn, but do disprove the asserted division in functions will the question of an inference arising from access be presented.[23]

## II. Inferences Arising From the Appearance of Evil

■ Interpretations of the Canons of Ethics have held that it is the duty of an attorney to avoid not only the actuality but the appearance of evil. In discussing Canon 36, H. S. Drinker in his Legal Ethics, p. 130, points out that one of the reasons for the rule forbidding the former public attorney to act in relation to any matter he passed upon while in government service is to prevent the appearance of evil—*i. e.* to prevent even the appearance that the government servant may take a certain stand in the hope of

later being privately employed to uphold or upset what he had done.[24] This rule finds application here in the government's contention that Mr. Horn should be disqualified if he passed upon or should have passed upon the validity of the pricing regulations in question in this controversy. Of course, if Mr. Horn did actually pass on the validity of these regulations, he is barred from participating in this case by the language of Canon 36. However, if he did not actually consider the question of whether these regulations were valid, I find that there is no appearance of evil arising from his now questioning their validity unless it is proven that he was specifically ordered to consider that question while in government employ. If he was so ordered, he cannot now be heard to urge that he shirked his duty in the past and is, therefore, free to raise the question presently. This exception to the necessity of proving actual investigation of the matter in question will be applied, however, only when the attorney's duty to pass upon that particular matter, was very clear.[25] The factual questions raised by this rule

concerning the events and explaining these documents. The basic issue here is really one of documentary interpretation.

23. This access inference will be discussed with the problem of imputed knowledge, *infra.*

24. This appearance of evil rationale would also seem to explain the rule applied to privately employed attorneys that the attorney may not attack the validity of his own work. It has been held that where an attorney draws a document for a client, or advises a client to take a certain legal position, he is forever barred from asserting that that position was unsound or that document invalid. See Thatcher v. United States, 6 Cir., 1914, 212 F. 801; Federal Trust Co. v. Damron, 1933, 124 Neb. 655, 247 N.W. 589; A. B. A. Opinions #33, 64, 71, 177; City Opinion #32; County Opinion #156. See also Drinker, op. cit. pp. 113–114. Outside these restrictions, however, an attorney is free to change his legal viewpoint generally; the ethical question is posed only when the lawyer attempts to change his viewpoint with respect to the merits of a specific matter with which he has previously dealt.

25. The question of what creates an appearance of evil is largely one of ethical mores; it is interesting to note, therefore, that the New York County Lawyers' Association and the Association of the Bar of the City of New York, in their briefs *amicus curiae* in the instant case, considered the possible application of the "should have passed upon" test urged by the government, and rejected it. Both groups maintained that disqualification was called for only where the attorney in question had actually passed on the validity of the regulation in question while in government service, or had, while in that service, gained knowledge of a weakness in it. The Association of the Bar specifically approved the formula for the "actuality" test set forth in this opinion, *i. e.*, that proof of actual investigation of the validity of a regulation will not be necessary to bar an attorney where there is proof of a clear and unequivocal duty on his part to so investigate. The Association of the Bar pointed out that this must be a duty to *investigate the validity* of a regulation as opposed to the duty of *applying* an existing regulation where no question of validity is raised while so employed. The lat-

as applied to this case will be discussed after consideration of one more inference arising under these Canons.

## III. Inference of Imputed Knowledge Within a Partnership

It has been repeatedly held by courts and ethics committees which have considered these canons, that the knowledge of one member of a law firm will be imputed by inference to all members of that firm. In Laskey Bros. of West Virginia v. Warner Bros. Pictures, Inc., 2 Cir., 1955, 224 F.2d 824, 826–827, the Court said:

> "[A]ll authorities agree that all members of a partnership are barred from participating in a case from which one partner is disqualified.
> * * * *
>
> "Within the framework of the original partnership the fact of access to confidential information through the person of the partner with such specialized knowledge is sufficient to bar the other partners, whether or not they actually profit from such access. Such a result, although an extension of the literal wording of Canons 6 and 37 of the Canons of Professional Ethics of the American Bar Association, is necessary to facilitate maximum disclosure of relevant facts on the part of clients." [26]

This chain of imputed knowledge has been held to extend, not only to the partners in a law firm, but to salaried law clerks in a firm.[27] Applied to the instant case, treating the entire OSR/Paris office as a partnership, the government argues that if anyone in the OSR/Paris office would have been barred from taking part in this controversy, then Horn is barred. It then urges that there was such a close

association between the Counsel's Office in Washington and the Counsel's Office in Paris, that the chain of disqualification must necessarily extend from one office to another, and the Washington Counsel's Office was clearly involved in the present controversy from its inception.

The major premise on which the partnership disqualification theory is based, however, is that there was in the partnership office confidential information pertinent to the pending law suit to which all the partners had access. In this case, that basic premise is challenged by affidavits denying this alleged closeness between Washington and Paris, and the government has attempted to meet that challenge by producing documents from its files. If none of the documents the government has introduced rebut the import of those affidavits, the basic premise of knowledge within the office fails, the inference fails also, and the government is again left with the burden of proving actual knowledge.

### Applying Doctrine of Imputed Knowledge to Government Attorney

Applying this doctrine of imputed knowledge within a partnership to the present case, however, presents a difficulty not found when dealing with private law firms. As stated, the doctrine's basic premise is that there is a free flow of information within a *partnership office* so that the knowledge of one member is the knowledge of all. When dealing with a government attorney, the question remains, within what *office* is that free flow of information assumed to exist. In this case, for example, is the office the overall ECA agency itself, OSR/Paris, or the General Counsel's Office of OSR/Paris.

ter duty would not bar an attorney from later contesting validity. Association of the Bar of the City of New York, Brief Amicus Curiae, pp. 2–4; New York County Lawyers' Association, Brief Amicus Curiae, pp. 9–15.

26. Similar views have been expressed by the A. B. A. Committee on Professional Ethics. See Opinions #33, 49, 72, 103.

27. See City Opinion #2. In the Fisher

case (cited Note 12 *supra*), on which the Laskey case is based, the attorney with actual knowledge was a salaried lawyer at the time he received the information. In Consolidated (cited Note 10 *supra*), the attorney in question had also been a salaried law clerk at the relevant time. In that case the Court said expressly that Canon 6 as well as Canon 37 covered salaried lawyers.

This question arises in analogous form with relation to the inference set forth in the T. C. Theatre case that if an attorney had access to materials of the former client which are substantially related to the present controversy, it will be presumed that he came into contact with confidential information relating to the controversy, and he will be disqualified. Who is the client which the former government attorney represented and to whose files will access be presumed? Through what divisions and sub-divisions of a large government office will an attorney, who actually can go to any file, be presumed to have gone to such files regardless of his personal job assignments? At this point, when dealing with the government attorney, the client he represented and the partnership of which he was a member become merged. This is so because the basic problem is not merely to identify the former client here, which is in a larger sense the United States Government *in toto,* but rather to identify the interests with respect to which the attorney represented the client, for it is only as to these interests that he is disqualified. In identifying these interests one is confronted by the question of whether this attorney is to be considered as having represented the government in matters pending within his immediate office, or within a broader agency to which that office is attached, or solely in matters which he himself handled. In other words, the full circle has been swung and a decision must be made as to whether the theory of imputed knowledge as applied to members of a law partnership applies to attorneys working for the government; if it does, what office marks the boundary of imputation?

Guidance on this point can be taken from the language of Canon 36 which was enacted in 1928, twenty years after the American Bar Association originally adopted the first 32 Canons, and which deals specifically with lawyers retiring from public positions.[28] This Canon forbids a former government attorney to accept employment "in connection with any matter which he has *investigated or passed upon* while in such office, or employ." (Italics supplied.) The main purpose of this Canon was to clarify the duties in Canon 6 as related to government attorneys—chiefly, it avoids the "client" language of Canon 6 which presents serious difficulties in this sphere. Although it cannot be considered as completely superseding Canon 6 in dealing with a lawyer's duty to a former client, Canon 36 undoubtedly serves as a guide to the chief purpose of the ethical principle involved and the words "investigated" or "passed upon" imply a test of actual personal knowledge or action.[29] However, it is also undoubtedly the purpose of the Canons generally to avoid the appearance that an attorney has taken a position contradictory to his former client's interests although, in fact, he may not have done so. This second purpose makes it impossible to hold that Canon 36 permits of none of the previously discussed in-

---

**28.** See Drinker, *op. cit.* pp. 24–25. This Canon is applicable to all public positions, of course, not just those of the United States government, though the larger the governmental unit, the more difficult the problems of identifying the attorney's former client and his former "partnership" office.

**29.** Such a conclusion is buttressed by the views of the two Bar Associations discussed in Note 25 *supra.*

Further, the words "investigated" or "passed upon" seem indicative of a requirement that an attorney has done more than *see* certain confidential files. Although the cases discussing the access rule have not considered this point, a possible explanation for their not having done so is that, in those cases, it was clear that the attorney in question had done far more than just accidentally see or briefly peruse and initial a related document. True, these cases for the most part did not deal with government officials, but a consideration of this nature would be valid in all cases. Again, common sense dictates that an attorney should not be disqualified where actual knowledge of the controversy based on his former employment is non-existent, but this stricture must be considered in relation to the problem of avoiding the appearance of evil. Once more, an *ad hoc,* practical approach to the specific factual problems in each case is indicated.

ferences where a former government attorney is involved. The language of that Canon, however, must be held to require that a practical test be employed in determining when an appearance of evil exists: *i. e.* in each instance the fact finder must determine whether it was likely that the particular government attorney would have attained knowledge of or taken a stand on the subject matter of the particular controversy. If there is no practical likelihood, there is no appearance of evil.

### Vertical and Horizontal Imputation of Knowledge to Government Attorneys

■ Where an attorney is head of his office or a subdivision of it, as was Mr. Horn during part of his tenure, there is, of course, imputed to him knowledge of the proceedings taken by his juniors. This is a vertical theory of imputed knowledge well founded in rules of ultimate responsibility.[30] However, for such an official there is still the problem of horizontal imputation of the knowledge of another division head of coordinate rank within the same larger agency.

Again, there may sometimes be a rebuttable presumption of imputed knowledge, but this is the kind of question which must be decided on an *ad hoc* basis depending on the particular factual relationship between the two divisions or the two personalities involved and the likelihood that knowledge passed freely between them. In the instant case, the decision as to imputed knowledge, if any, must await closer examination of these facts.[31]

In view of the importance of the determination being made in the instant case in a virgin area of the law, further discussion is in order of those unique problems which arise when these Canons are applied to government attorneys.

### Unique Problems Presented in Cases of Public Employment

Support for applying this practical, factual test in cases involving the disqualification of former government attorneys can be found in recognition of the serious problems which would otherwise arise—problems particularly acute where the employment was with the United

30. This vertical imputed knowledge rule was employed in A. B. A. Opinion #37. See, also, Porter v. Huber, D.C.W.D. Wash.1946, 68 F.Supp. 132.

31. The New York County Lawyers' Association, in its brief, considered whether, assuming the data in certain documents would disqualify Mr. Horn, he should be chargeable with knowledge of their contents when neither he nor the government has present knowledge of whether he actually saw the documents in question. It stated:

"In our opinion a distinction should be drawn between Mr. Horn's chargeability with the contents of data or information contained in documents received at E. C. A., Paris, while he was merely one of several attorneys in the office * * * and information or data * * * received in E. C. A. Paris while Mr. Horn was * * * in a supervisory capacity over the work of all the attorneys in the office.

While Mr. Horn served merely as one of the attorneys, it is our opinion that, in the absence of proof that a particular document was routed to him, or that he learned of its contents in some other

way, Mr. Horn should not be charged with knowledge of the contents of the document. During the periods * * * [when he acted in supervisory capacity] we are of the opinion that, in the absence of proof that he did not see a document, or learn of its contents in some other way, he should be chargeable with the contents of all documents which passed through the Legal Section." (Brief of the New York County Lawyers' Association, Amicus Curiae, pp. 6–7.)

A position akin to that of the New York County Lawyers' Association was taken by the Association of the Bar, which said, "In the application of Canons 6 and 36, there should be no presumption of a lawyer's access to or actual knowledge of information." (Brief Amicus Curiae, p. 2). It added:

"If it is found that Mr. Horn had access to certain files but failed to make use of such access and was not directed by his superior to examine the files, then no case for his disqualification under Canon 36 can be said to have been made out in that respect." (Brief Amicus Curiae, p. 2.)

Compare A. B. A. Opinion #134.

States Government as opposed to some smaller public body.[32] The government itself does not expect to bar a former government servant from participating in any case against the government involving in any way the agency in which he was employed.[33] The size and diversity of function of many government agencies prohibit any such broad conclusion. The fact that the government is a client difficult to identify, and that the "firm" of which the government attorney is a part is difficult to limit in scope, were factors in the establishment of the more specific "investigated" or "passed upon" language of Canon 36. Although the confidence and adverse interests rules of Canons 6 and 37 still bind the former government attorney with a duty of fidelity, that duty must be given a practical scope. This is important for the benefit of the government which must constantly recruit attorneys from private practice. If service with the government will tend to sterilize an attorney in too large an area of law for too long a time, or will prevent him from engaging in practice of the very specialty for which the government sought his service—and if that sterilization will spread to the firm with which he becomes associated—the sacrifices of entering government service will be too great for most men to make. As for those men willing to make these sacrifices, not only will they and their firms suffer a restricted practice thereafter, but clients will find it difficult to obtain counsel, particularly in those specialties and suits dealing with the government.[34]

## Ethical Problems Cannot Be Viewed in a Vacuum

These practical problems undoubtedly were factors leading to the formulation of Canon 36; they have been given recent consideration by the Court of Appeals for the Second Circuit, and have been recently discussed by both the Yale Law Journal and the Harvard Law Review.[35]

In Laskey Bros. of West Virginia v. Warner Bros. Pictures, Inc., 2 Cir., 1955, 224 F.2d 824, in a disqualification proceeding, the Second Circuit was confronted with a former partner in a pri-

32. The practical and ethical problems faced by present and former government attorneys with relation to federal statutes on this subject are thoroughly discussed in McElwain and Vorenberg, The Federal Conflict of Interest Statutes, 65 Harv.L.Rev. 955 (1952).

33. See Plaintiff's reply to Memorandum of Bethuel M. Webster as Amicus Curiae, pp. 15, 17.

34. A converse problem arises when an attorney who has represented several corporate clients enters government service as the head of a department or as a lower ranking official, and that department wishes to undertake an investigation of or lawsuit against his former clients. If he is head of the department, knowledge of his subordinates' activities is imputed to him as is responsibility for their actions. A former department chief is barred from undertaking to represent in private practice any interests adverse to the government in any matters which were pending in his department during his tenure; why should not the present chief be barred while in government service from undertaking any activities adverse to interests of his former client. And if he is barred, why not his subordinates since he is held responsible for their actions. The answer which has been reached is that the hands of the government cannot be tied because of the former associations of one of its officials; therefore, that top person disqualifies himself from handling that particular matter, and the conflict of interest question is considered resolved. Similarly, the particular lower ranking attorney disqualifies himself and another attorney handles the matter. No such opportunity is given to one partner in a law firm to disqualify himself and qualify the firm. The only explanation for the difference in result is that the practical exigencies are more compelling in the former situation than the latter. This is another illustration of the fact that ethical problems cannot be viewed in a vacuum; practical, everyday facts of life must be considered.

35. See Note, Disqualification of Attorneys for Representing Interests Adverse to Former Clients, 64 Yale L.J. 917, 927–928 (1955); Casenote, 68 Harvard L. Rev. 1084 (1955).

vate law firm, who would have been barred from taking the case in question if he had remained a member of that firm because of the theory of imputed knowledge. The Court held that although the presumption of imputed knowledge is irrebuttable while a partnership exists, after its dissolution or after an attorney leaves the firm, a former partner barred only by imputed knowledge may rebut the inference that he received confidential information from the attorney with actual knowledge.[36] It held further that the testimony of the former partner was itself sufficient rebuttal. Discussing the practical problems which would be raised by any stricter application of the partnership-imputed knowledge rule, the Court said:

"Since the degree of association to effect disqualification need not necessarily be that of a partner, young lawyers might seriously jeopardize their careers by temporary affiliation with large law firms. But even more important is the effect on litigants who may seriously feel they have claims worthy of judicial testing, but are prejudiced in securing proper representation. For the net effect of an overharsh rule of disqualification must be to hinder adequate protection of clients' interests in view of the difficulty in discovering technically trained attorneys in specialized areas who were not disqualified, due to their peripheral or temporally remote connections with attorneys for the other side. See Note, 64 Yale L.J. 917, 928. The necessity of judicial recognition of the contingent fee is an appropriate analogy."[37]

Aside from these practical problems, it is doubtful if the Canons of Ethics are intended to disqualify an attorney who did not actually come into contact with materials substantially related to the controversy at hand when he was acting as attorney for a former client now adverse to his position.[38] I agree, that where there is a close question as to whether particular confidences of the former client will be pertinent to the instant case, an attorney should be disqualified to avoid the appearance if not the actuality of evil. But, where an attorney has worked for a vast agency of the United States government, as in the instant case, it is hardly reasonable to hold that an appearance of evil can be found in his undertaking a case against the government where there is not some closer factual relationship between his former job and the case at hand other than that the same vast agency is involved.

36. In the District Court opinion in Laskey, and in the T. C. Theatre case, the burden of proving that the knowledgeable attorney had conveyed that information to his former partner was placed upon the complainant. For other treatment of this problem see A. B. A. Opinion #167 and City Opinion #793.

37. The Yale article cited was a critique of the possible harsh, practical consequences which might arise in other cases based on the broad disqualification precedent of the Consolidated case where the Court had said that the public policy of the Canons outweighed practical considerations. The Laskey opinion thus clearly represents a back-tracking from the broad statement in Consolidated. For an illustration of how far this chain of disqualification could otherwise extend see A. B. A. Opinion #33.

38. "The test of inconsistency is not whether the attorney has ever appeared for the party against whom he now proposes to appear, but it is whether his accepting the new retainer will require him, in forwarding the interests of his new client, to do anything which will injuriously affect his former client in any matter in which he formerly represented him, and also whether he will be called upon, in his new relation, to use against his former client any knowledge or information acquired through their former connection." In re Boone, C.C.N.D.Cal. 1897, 83 F. 944, 952–53. This statement has been repeatedly quoted as establishing the basic test of consistency of the attorney's present and past positions. See also Note, 51 A.L.R. 1312–1315; Drinker, *op. cit.*, pp. 107–108; City Opinions #87, 119, 383, 508, B–26, 8–32, B–172.

## Application of Principles to Instant Case

Recapitulating the positions, defendant rests its case on the alleged fact that there was a clearcut division in functions between the Washington and Paris offices, and that the former office had sole responsibility for and actually solely handled all problems relating to pricing, procurement and refunds, including the drafting, promulgation and enforcement of the various regulations which are the subject matter of this controversy. It supports this contention chiefly with two lengthy affidavits by Mr. Horn: the first sets forth in detail the specific nature of all the duties of the personnel of the OSR/Paris General Counsel's Office while he was a member of its staff;[39] the second is a document-by-document explanation of the papers on which the government rests its case. Mr. Horn's affidavits are supported by the affidavits of 13 key officials of OSR/Paris and/or ECA/Washington who attest to that same functional division,[40] and by the affidavits of Arthur H. Dean as to the background of the present controversy. These affidavits establish that the work of the Paris office was unrelated to the instant controversy and refute any actuality or appearance of evil.

 The government, complainant herein, had the burden of coming forward with evidence to dispel the effect of these affidavits. Specifically, to show grounds for disqualifying Mr. Horn in the present controversy, the government had the burden of either showing that he actually received relevant confidences or passed on the subject of the controversy, or that, although such personal active participation cannot be proved, his former duties were so substantially related to the present controversy that an appearance of evil arises from his taking part in this suit.

To support its contention that Mr. Horn's duties did bring him into contact with the subject matter of the present controversy in such a way as to disqualify him from proceeding as attorney for defendant in this action, the government has submitted some 25 assorted documents from its files, and two explanatory affidavits by Judge Stanley N. Barnes, Assistant Attorney General in charge of the Anti-trust Division, United States Department of Justice. Unlike the affidavits submitted by defendant, Judge Barnes' affidavits are based, not upon personal knowledge of ECA and OSR operations during the time in question, but upon interpretations which he has given the submitted documents without such personal knowledge.[41]

## Conclusion

After careful study of these documents, the government's interpretation of their significance as set forth in the Barnes affidavits and government oral argument,[42] Mr. Horn's explanation of their significance in his affidavits of August 3 and September 26, 1955, and the supporting affidavits submitted by Sullivan & Cromwell—it is my considered opinion that the government has failed to present grounds for ordering the disqualification of Mr. Horn and his firm as defense attorneys in this case, and that the division in functions between OSR/Paris and ECA/Washington has been clearly established.

Specifically, the government has failed to prove:

(1) that Mr. Horn had access to documents substantially related to the subject matter of the instant case;

---

39. None of these duties, as set forth, deals in any way with the subject of this controversy.

40. The names and official positions of these affiants, and their periods of tenure are set forth in an unreported Appendix to this Opinion: Appendix A.

41. Mr. Horn points out in his affidavit of September 26, 1955 (p. 190) that Judge Barnes has never had any connection with ECA and its successor agencies, and did not become associated with the Fed-

eral Government until 1953. He avers similarly that Mr. Herter, present General Counsel of the I. C. A. (ECA's ultimate successor) whose descriptive affidavit accompanied the government exhibits, became associated with the organization in 1954, and he, too, has had no actual experience with OSR/Paris or its legal offices.

42. This oral argument, which was submited in printed form, also considers and interprets the submitted documents.

(2) that he ever had access to and/or actually saw or worked on any relevant confidential materials;

(3) that he ever investigated or passed upon the subject matter of the instant case;

(4) that he ever rendered any legal advice or opinion in relation to the regulations which are the subject matter of the instant case; and

(5) that despite these conclusions, Mr. Horn's present position creates an appearance of evil requiring disqualification.[43]

These conclusions have been reached after a thorough document-by-document analysis of the papers upon which the government bases its motion.[44] Many of these documents fail on their face to show any conceivable disqualifying relationship between their content and the subject matter of the present controversy. Others bear a surface relationship, but can be and are satisfactorily explained as unrelated owing to the functional division between ECA/Washington and OSR/Paris, a division which the government does not either disprove or place in substantial doubt. For example, the government placed great reliance on Civil Service Job Description Sheets which imposed upon the General Counsel and his staff the duty of drafting and interpreting legislation on the operating phases of the program, but it made no attempt to show why the word "operating" should not be read as limiting that office's duties to the problems encountered in European operations—operations in no way concerned with pricing and procurement policies. The latter interpretation is supported by thirteen knowledgeable affiants and contradicted only by the speculations of Judge Barnes and Mr. Olson, the Special Assistant who presented the government's argument on the instant application. Neither of these proponents has any personal knowledge as to the operations of either ECA or OSR during the period in question.

Similarly, another series of documents upon which the government placed considerable stress consisted of three missives dealing with a publicized change in price policy—a change which ultimately took effect as Amendment 5 to Regulation 1. In presenting these documents, the government did not consider it relevant that the Amendment in question dealt with petroleum products and not crude oil; that the missives did not in any way discuss whether defendant had been charging over ECA maximum prices for such products; that two of the three missives in question were copies of letters sent direct to defendant and other oil companies; that Paris was clearly being told what Washington had done, not being asked its opinion on whether the new policy was sound; and that the last missive was a request for information sent from Paris to Washington which clearly reflected complete ignorance of that price policy on the part of the Paris office.

Most of the other government exhibits go even further afield. Examination of

---

43. With regard to the government's contention that there is an appearance of evil arising from the fact that out of 85 men in the firm of Sullivan & Cromwell, Mr. Horn is a key figure in the present suit, it must be pointed out that Mr. Horn's specialty is the field of foreign economic and legal problems. If he is not qualified to act, his firm would be disqualified regardless of his participation, under the partnership-imputed knowledge theory. If he is qualified, there is no appearance of evil arising from his participating in the case rather than some other partner. To contend for this would be to place the single practitioner in a more favored position.

44. In an unreported appendix to this decision, Appendix B, I have analyzed each document, giving the Exhibit number and (a) the government's interpretation of the document; (b) Mr. Horn's explanation of it; (c) my conclusions with respect to it. Included also in a separate appendix, Appendix C, are discussions of the estoppel defense and the counterpart fund defense—defenses which I find to be no grounds for disqualification here by reason of the unrefuted affidavits of Mr. Horn and Mr. Dean. Also considered in that Appendix are several other pertinent affidavits not included in the documentary discussions in Appendix B.

them leads me to the conclusion that, in preparing its case, the mere mention of the word "petroleum" in a document caused the government to assume its relevancy to the instant case and its pertinence to the instant motion. But, it must be borne in mind that a word appearing in empty space, with no history, expresses nothing. To be expressive of any meaning, the word must be considered in its context and background.

When dealing with ethical principles, it is apparent that we cannot paint with broad strokes. The lines are fine and must be so marked. Guide-posts can be established when virgin ground is being explored, and the conclusion in a particular case can be reached only after painstaking analysis of the facts and precise application of precedent.[45] After full consideration of all applicable principles, I hold that the motion of the government to disqualify Mr. Horn and his firm as defense attorneys is denied, and the motion of Sullivan & Cromwell for an order decreeing them to be qualified as attorneys herein is granted. So ordered.

45. "[S]ome of the greatest errors in thinking have arisen from the mechanical, unreflective, application of old formulations—forgetful of a tacit 'as if'—to new situations which are sufficiently discrepant from the old so that the emphasis on the likenesses is misleading and the neglect of the differences leads to unfortunate or foolish consequences." United Shipyards v. Hoey, 2 Cir., 1942, 131 F.2d 525, 526–527.