**EMPIRE LINOTYPE SCHOOL, Inc.,**
**Plaintiff,**

v.

**The UNITED STATES of America,**
**Defendant.**

United States District Court
S. D. New York.

June 29, 1956.

Philip Strauss, New York City, for plaintiff.

**628**

Paul W. Williams, U. S. Atty., New York City, for the Southern District of New York for the United States. Arthur B. Kramer, Asst. U. S. Atty., New York City, of counsel.

HERLANDS, District Judge.

A civil suit has been brought by the Empire Linotype School, Inc.[1] (referred to in this opinion as "Empire") against the United States of America[2] for the sum of $6,705.35, allegedly due and owing Empire for services performed by it pursuant to a series of contracts between it and the Veterans Administration (referred to in this opinion as the "VA").[3]

The Government, invoking Canons Nos. 6, 36 and 37 of the Canons of Professional Ethics of the American Bar Association,[4] has moved to disqualify Empire's

1. Empire Linotype School, Inc. is a school recognized and duly licensed to train veterans pursuant to the provisions of Public Laws Nos. 16 and 346, 78th Congress, 38 U.S.C.A. § 701(f), Veterans' Regulation No. 1 (A), pt. 8, 38 U.S.C.A. following section 745 and Servicemen's Readjustment Act of 1944, 38 U.S.C.A. § 693 et seq.

2. Jurisdiction over plaintiff's claim is based on 28 U.S.C.A. §§ 1346, 2401–2411.

3. The relevant contractual history between Empire and the VA is set forth in the following table:

| Period of Time | Contract | Amount in Dispute |
|---|---|---|
| July 28, 1950 to Nov. 30, 1950 | Contract No. V3006V917 and Supplement No. 1 thereto | $1,899.00 |
| Dec. 1, 1950 to Nov. 30, 1951 | Contract No. V3006V981 and Supplement No. 1 thereto | 6,957.75 |
| Dec. 1, 1951 to Nov. 30, 1952 | Contract No. V3006V1370 | 2,203.45 |
| Dec. 1, 1952 to Nov. 30, 1953 | Contract No. V3006V1796 | 1,081.36 |
| Dec. 1, 1954 to Nov. 30, 1955 | Contract No. V3006V1970 | 1,960.85 |
| July 16, 1951 to date of filing the complaint | Interim Letter of Sept. 21, 1951, supplemented by Interim Letter of June 24, 1954, further supplemented by Interim Letter of Oct. 14, 1954 | 2,459.94 |
| July 17, 1955 to date of filing the complaint | Memorandum agreement of July 17, 1955 | 246.40 |

4. "[Canon] 6. Adverse Influences and Conflicting Interests

"It is the duty of a lawyer at the time of retainer to disclose to the client all the circumstances of his relations to the parties, and any interest in or connection with the controversy, which might influence the client in the selection of counsel.

"It is unprofessional to represent conflicting interests, except by express consent of all concerned given after a full disclosure of the facts. Within the meaning of this canon, a lawyer represents conflicting interests when, in behalf of one client, it is his duty to contend for that which duty to another client requires him to oppose.

"The obligation to represent the client with undivided fidelity and not to divulge his secrets or confidences forbids also the subsequent acceptance of retainers or em-

attorney, Philip Strauss on the ground that he was formerly a Government attorney and, in that capacity, actually passed upon a number of matters involved in the present suit.[5]

The premises upon which the Government's motion is based will become apparent from the following statement of facts detailing (1) the attorney's professional activities prior to the commencement of the present action and (2) the background out of which the present action arose.

Mr. Strauss worked for the Federal Government in various capacities from July 10, 1940 to May 7, 1954, when he resigned to enter the private practice of law. During the period from October 1, 1950 to the date of his resignation on May 7, 1954, Strauss was employed in the Vocational Rehabilitation and Education Division of the New York Regional Office of the VA as a "contract officer" and, for a period of time, as a "contract supervisor." Strauss commenced private practice on May 10, 1954.

On August 23, 1954, Rudolph Kay, Finance Officer of the New York Regional Office of the VA, received a telephone call from Strauss. The telephone conversation is summarized in a contemporaneous memorandum made by Mr. Kay. According to the memorandum, Strauss spoke of the alleged overpayment charged to Empire; and Strauss said that he had been retained by Edwin Jenkins, president of Empire, for the purpose of discussing the VA's claim of overpayment.

On May 2, 1955, Empire caused to be filed by its attorney, Strauss, a complaint alleging nine causes of action against the VA. The proper disposition of the motion at bar requires some detailed description of these claims, as pleaded. Eight of the nine alleged causes of action [6] arise out of a series of contracts between Empire and the VA whereby, in return for payments from the VA, Em-

ployment from others in matters adversely affecting any interest of the client with respect to which confidence has been reposed."

"[Canon] 36. Retirement from Judicial Position or Public Employment

"A lawyer should not accept employment as an advocate in any matter upon the merits of which he has previously acted in a judicial capacity.

"A lawyer, having once held public office or having been in the public employ, should not after his retirement accept employment in connection with any matter which he has investigated or passed upon while in such office or employ."

"[Canon] 37. Confidences of a Client

"It is the duty of a lawyer to preserve his client's confidences. This duty outlasts the lawyer's employment, and extends as well to his employees; and neither of them should accept employment which involves or may involve the disclosure or use of these confidences, either for the private advantage of the lawyer or his employees or to the disadvantage of the client, without his knowledge and consent, and even though there are other available sources of such information. A lawyer should not continue employment when he discovers that this obligation prevents the performance of his full duty to his former or to his new client.

"If a lawyer is accused by his client, he is not precluded from disclosing the truth in respect to the accusation. The announced intention of a client to commit a crime is not included within the confidences which he is bound to respect. He may properly make such disclosures as may be necessary to prevent the act or protect those against whom it is threatened."

Pirsig, Cases and Materials on Legal Ethics (1949) 21 ff, 40 ff, contains a collection of cases dealing with the problems of conflicting interests and confidential communications.

5. Rule 5(c), General Rules of the United States District Court for the Southern District of New York, adopts the canons of ethics of the American Bar Association as one of the criteria to be used in determining what constitutes "professional misconduct."

6. The ninth cause of action states a claim for $960., allegedly due and owing to Empire as "the fair and reasonable value of the administrative work performed by plaintiff in connection with the training of veterans under the Provisions of Public Law 550, Eighty Third [82d] Congress [38 U.S.C.A. § 901 et seq.]"

pire was to, and allegedly did, furnish and provide certain instruction, books, supplies and equipment to veterans. These causes of action, as pleaded, vary only in respect of the periods of time involved, the various separate contracts covering these respective periods, and the different sums of money due and owing.

The first and second causes of action are based upon Contract No. V3006V1796 (covering the period from December 1, 1952 to November 30, 1953), under which Empire claims the sum of $1,081.36.

The third and fourth causes of action are based upon Contract No. V3006V1970 (covering the period from December 1, 1954 to November 30, 1955), under which Empire claims the sum of $1,960.-65.[7]

The fifth and sixth causes of action are based on an "interim letter" of September 21, 1951, supplemented by an "interim letter" of June 24, 1954, and further supplemented by an "interim letter" of October 14, 1954. The "interim letters" cover a period beginning July 16, 1951 and continuing to the date of the filing of the complaint. Empire claims that $2,459.94 is due and owing, pursuant to the "interim letter" agreements.

The seventh and eighth causes of action are based upon a "memorandum agreement" (covering a period from July 17, 1955 to the date of the filing of the complaint) under which Empire claims the sum of $246.40 as due and owing.

In its answer, the Government has asserted three counterclaims (totaling $11,060.20), covering periods antecedent to the time covered by the contracts upon which Empire's claims are based. The first counterclaim is based upon Contract No. V3006V917 and Supplement No. 1 thereto (covering the period from July 28, 1950 to November 30, 1950), under which the Government asserts it made an overpayment of $1,899.00.

The second counterclaim is based upon Contract No. V3006V981 and Supplement No. 1 thereto (covering the period from December 1, 1950 to November 30, 1951), under which the Government asserts it made an overpayment of $6,957.75.

The Government's third counterclaim is based upon Contract No. V3006V1370 (covering the period from December 1, 1951 to November 30, 1952), under which the Government asserts it made an overpayment of $2,203.45.

From the arguments presented to the Court, it appears that the pivotal issue in this litigation is whether overpayments were made by the Government under the three contracts upon which the counterclaims are based. The Government's position concerning the alleged overpayments may be stated as follows: (1) that in the latter part of 1952, the VA learned that veterans attending classes at Empire's school were regularly permitted to take one-half hour "breaks" for meals in the morning and afternoon, and that the VA was being billed for these "breaks" as regular hours of instruction, contrary to the provisions of the applicable contracts; (2) that thereafter, a series of investigations confirmed the fact that Empire had sanctioned these recesses; (3) that the VA ascertained that it had overpaid Empire $11,060.20 for the hours of instruction actually provided in the period between July 28, 1950 and November 30, 1952; and (4) that, in order to recoup this amount, the VA withheld payments due under the contracts which it had with Empire for periods subsequent to November 30, 1952, which latter contracts form the basis for Empire's action.

The gist of Empire's position is that no half-hour recesses were in fact ever

7. The amount alleged to be due and owing plaintiff under Contract No. V3006V1970 is stated to be $1,960.85 in the third cause of action, $1,960.65 in the fourth cause of action, $1,960.65 in plaintiff's prayer for relief, and $1,960.85 in the affidavit of the Assistant United States Attorney in support of the Government's motion. Since, for purposes of the pending motion, nothing of significance appears to hinge on the exact amount, I have arbitrarily assumed the correct amount to be $1,960.65.

permitted, and that Empire is entitled to the withheld moneys.

A preliminary point raised by the affidavit in opposition to the motion criticizes the Government's delay in making the motion to disqualify. This attack is predicated upon the fact that, whereas Empire's complaint was filed on May 22, 1955 and the Government's answer on August 10, 1955, it was not until April 2, 1956—seven days after the case had been answered ready for trial by plaintiff on the calendar call—that the Government first raised the question of Strauss' eligibility to appear as attorney for Empire.

 Assuming *arguendo* that the Government had delayed making the motion to disqualify, the Court would not be precluded or estopped from adjudicating the question now before it. The Court's duty and power to regulate the conduct of attorneys practicing before it, in accordance with the Canons, cannot be defeated by the laches of a private party or complainant. Thus, the Court, on its own motion, may disqualify an attorney for violation of the Canons of Ethics. Porter v. Huber, D.C.W.D.Wash.1946, 68 F. Supp. 132. And, by a parity of reason, it is the responsibility of the Court to ascertain whether there is any merit to the accusation when once an alleged violation of the Canons has been called to the Court's attention. United States v.

Standard Oil Co., D.C.S.D.N.Y.1955, 136 F.Supp. 345, 351, note 6.

The relevant contracts cover the period from July 28, 1950 to May 2, 1955, the date of the filing of Empire's complaint. That period was encompassed within the period of Strauss' employment in the Vocational Rehabilitation and Education Division of the New York Regional Office of the VA (October 1, 1950 to May 7, 1954), which office handled the very contracts involved in the litigation in chief. Were this the only evidence submitted by the Government, extreme doubt would be cast upon the propriety of Strauss' representation of Empire in the present action.[8]

But the Government's case is much stronger. In support of its motion, the Government has submitted the affidavit of Harry E. Rosenthal (contract officer in the Vocational Rehabilitation and Education Division of the New York Regional Office of the VA), establishing:

(1) that Strauss passed upon the interim letter of September 21, 1951, upon which plaintiff's fifth and sixth causes of action are based, and that Strauss' signature is on the file copy of that letter;

(2) that Strauss reviewed Contract No. V3006V1370, upon which the Government's third counterclaim is based, and that Strauss subscribed his name on the contract after the words "reviewed by";

8. Cf. the scholarly and exhaustive opinion of Judge Irving R. Kaufman in United States v. Standard Oil Co., D.C. S.D.N.Y.1955, 136 F.Supp. 345. In that case, the United States sued to recover overcharges on sales of crude oil to European firms, which sales had been financed by the E.C.A. It was alleged that, between April 1948 and August 1952, the defendants had charged prices in excess of the maximum permitted by the Economic Cooperation Act and the regulations thereunder. The answer denied the overcharges and alleged that the regulations were invalid. The Government there (as in the case at bar), invoked Canons 6, 36 and 37 and moved to disqualify defendants' counsel on the ground that a partner, working on the case, had been employed in the Paris office of the E.C.A. from May 1949 until October 1951 as attorney, and later as general counsel, in the Office of the Special Representative (O.S.R./Paris). The motion to disqualify was denied, but only upon a clear showing by defendants' counsel that a sharp bifurcation of function had existed within the E.C.A., pursuant to which the sales involved in the litigation in chief had been negotiated through and supervised by the Washington office of the E.C.A.; that O.S.R./Paris never had any contact with the sales involved in the suit and had had no records or memoranda concerning such sales; and that the challenged partner's activities, while in the employ of the E.C.A., were strictly limited to O.S.R./Paris.

The Standard Oil Co. case is noted in 69 Harv.L.Rev. 1339 (1956).

(3) that Strauss prepared Supplement No. 1 to Contract No. V3006V722 between Empire and the VA;

(4) that Empire sent a letter, dated October 17, 1950, to the VA, addressed to Strauss' attention, concerning tuition payments to Empire;

(5) that a letter, dated October 19, 1950, sent to Empire, concerning notification of termination of contract, had been prepared by Strauss;

(6) that Strauss reviewed and signed the file copy of a letter to Empire, dated August 11, 1952, fixing the fair and reasonable tuition rate for certain of the training provided by Empire subsequent to July 16, 1951.

■ The above facts are not disputed by Strauss. His contention is that the Canons cited by the Government are not applicable [9] because the only issue in the litigation in chief is whether or not Empire gave its students half-hour recesses. With this contention the Court does not agree.

In the Court's opinion, Strauss is disqualified from representing plaintiff in the present action by virtue of Canons 6, 36 and 37.

Canons 6 and 37 impose dual duties: (1) a duty of nondisclosure of confidential information obtained by the attorney; and (2) a duty of fidelity, regardless of the fact whether confidential information had been imparted to the attorney, which duty prohibits the attorney from appearing against a former client in connection with a matter which he had previously handled for that client.[10] Strauss' continued representation of Empire would be violative of both the letter and the spirit of the criteria embodied in Canons 6 and 37.

Strauss argues that the Government has not demonstrated that any confidential matter was disclosed to him in connection with the litigation in chief. The fallacy in that argument is that no such showing is necessary. It is sufficient for the Government to show that Strauss, while in the employ of the VA, had *access* to material that is substantially related to the subject-matter of the suit in which disqualification is sought. As Judge Weinfeld aptly pointed out in T. C. Theatre Corp. v. Warner Bros. Pictures, Inc., D.C.S.D.N.Y.1953, 113 F. Supp. 265, 268–269;

"I hold that the former client need show no more than that the matters embraced within the pending suit wherein his former attorney appears on behalf of his adversary are substantially related to the matters or cause of action wherein the attorney previously represented him, the former client. The Court will assume that during the course of the former representation confidences were disclosed to the attorney bearing on the subject matter of the representation. It will not inquire into their nature and extent. Only in this manner can the lawyer's duty of absolute fidelity be enforced and the spirit of the rule relating to privileged communications be maintained." [11]

9. Strauss' opposing affidavit oversimplifies the fundamental question by stating: "The sole issue raised on this motion is whether deponent should withdraw as counsel for the plaintiff simply and exclusively because he was a Government attorney more than two years ago."

10. The *amicus curiae* brief of the New York County Lawyers Association, submitted pursuant to the request of the Court in United States v. Standard Oil Co., supra, states: " * * * it is the confidential relationship between attorney and client, in reliance upon which the information is imparted by the client to the attorney, and not the confidential nature of the information itself, which creates the disqualification."

See Disqualification of Attorneys for Representing Interests Adverse to Former Clients, 64 Yale L. Journal 917, 920 (1955); Drinker, Legal Ethics, 109 (1953).

11. The Court of Appeals for the Second Circuit has approved Judge Weinfeld's reasoning. Consolidated Theatres, Inc., v. Warner Bros. Cir. Man. Corp., 2 Cir.,

Strauss' continued representation of Empire would violate the duty of fidelity that he owes to the VA. The classic exposition of that duty is found In re Boone, C.C.N.D.Cal.1897, 83 F. 944, 952–953, where Circuit Judge Morrow said:

"The test of inconsistency is not whether the attorney has ever appeared for the party against whom he now proposes to appear, but it is whether his accepting the new retainer will require him, in forwarding the interests of his new client, to do anything which will injuriously affect his former client in any matter in which he formerly represented him, and also whether he will be called upon, in his new relation, to use against his former client any knowledge or information acquired through their former connection."

The problem of preventing a former public employee from taking personal advantage, intentionally or unintentionally, of his official position has received specific statutory recognition at all levels of government.[12]

While the Government is not proceeding herein under any of the federal conflict of interest statutes, the provisions of 18 U.S.C.A. § 284 are highly significant, because they clearly point up the impropriety of Strauss' continuing to act as attorney in the matter involved in the litigation in chief. 18 U.S.C.A. § 284 provides:

"Whoever, having been employed in any agency of the United States, including commissioned officers assigned to duty in such agency, within two years after the time when such employment or service has ceased, prosecutes or acts as counsel, attorney, or agent for prosecuting, any claims against the United States involving any subject matter directly connected with which such person was so employed or performed duty, shall be fined not more than $10,-000 or imprisoned not more than one year, or both."

The imposition of criminal law sanctions to deter the proscribed conflict of interest is an eloquent indication to Bench and Bar that the underlying public policy must be vigilantly protected.

The statute and the Canons set up a high moral standard,[13] akin to that applicable to a fiduciary. It is the Court's duty so to interpret that standard as to promote confidence in government and respect for the Bar. Without firm judicial support, the Canons of Ethics would be only reverberating generalities.

The motion to disqualify plaintiff's attorney in this case is granted.

1954, 216 F.2d 920. See Note, 69 Harv. L.Rev. 1339, 1340 (1956).

12. See McElwain and Vorenberg, The Federal Conflict of Interest Statutes, 65 Harv.L.Rev. 955 (1952); Davis, Federal Conflict of Interest Laws, 54 Col. L.Rev. 893 (1954); the "Code of Ethics" adopted by New York State, effective January 1, 1955, Public Officers Law, McK. Consol.Laws, c. 47, § 74; New York City Charter, § 886.

13. The interpretive theme underlying the A.B.A. opinions interpreting Canon 36, has been stated as follows: "The principle applied in those Opinions (16, 30, 34, 77, 118 and 134) is that an attorney holding public office should avoid all conduct which might lead the layman to conclude that the attorney is utilizing his public position to further his professional success or personal interest."
A.B.A. Op. 192, cited and quoted in Drinker, op. cit., 130, n. 14.