**The GOVERNMENT OF INDIA and the Food Corporation of India, Plaintiffs,**

v.

**COOK INDUSTRIES, INC. and Cook and Company, Defendants.**

No. 76 Civ. 2001.

United States District Court,
S. D. New York.

Nov. 19, 1976.

Delson & Gordon, New York City, for plaintiffs; Robert M. Delson, Norman Moloshok, Alvin H. Meadow, New York City, of counsel.

Fried, Frank, Harris, Shriver & Jacobson, New York City, for defendants; Victor S. Friedman, Jeffrey M. Siger, New York City, of counsel.

ROBERT J. WARD, District Judge.

Defendants Cook Industries, Inc. and Cook and Company ("Cook") move to disqualify the law firm of Delson and Gordon and Frederick W. Meeker, an associate in the firm, from continuing to represent plaintiffs in this action. For the reasons hereinafter discussed, the disqualification motion is granted.

## I. The Basis of the Present Action

The Government of India has purchased grain from Cook for a number of years. During 1975 and 1976, substantial publicity implicated Cook in a "grain scandal" involving alleged deliberate shortweighing and issuing of false inspection certificates whereby the grain actually shipped by Cook and other sellers was of less quantity and/or quality than indicated on the bills of lading and weight certificates. Ultimately Cook was indicted for its alleged role in the fraudulent scheme and pleaded *nolo contendere* to this indictment.

Subsequent to the public disclosures, on May 3, 1976 Delson and Gordon, on behalf of the Government of India and The Food Corporation of India ("Government of India"), filed a complaint in this Court against Cook,[1] alleging breach of contract and fraud in the delivery of grain of "inferior and . . . lesser value than the grain specified in the respective contracts in that they were short weight, of lower grade and quality, and were infested or contaminated." Complaint ¶ 9. Plaintiffs ask for at least $25,500,000 compensatory damages and $10,000,000 punitive damages, plus interest, costs and disbursements.

## II. The Prior Actions

Defendants' motion to disqualify Delson and Gordon, the Government of India's general counsel in the United States, and its associate attorney Mr. Meeker, from this multi-million dollar suit against Cook is based upon Mr. Meeker's defense of two similar claims against Cook just prior to his employment at Delson and Gordon.

Upon graduation from law school in 1972, Mr. Meeker became associated with Hill, Rivkins, Carey, Loesberg and O'Brien ("Hill, Rivkins"), a twenty-two member law firm specializing in admiralty law. In 1973, Mr. Meeker was assigned to defend two actions against Cook. *Shui Fa Oil Mill Co., Ltd. et al. v. M/S "Norma" & Austin Navigation Corp. Ltd. v. Cook Industries, Inc.,* 73 Civ. 250 and *Shui Fa Oil Mill Co., Ltd. et al. v. Cook Industries, Inc.,* 73 Civ. 251 (hereinafter "Soybean Actions").[2]

The Soybean Actions arose out of an alleged breach of contract wherein a shipment of soybeans to plaintiffs was 254 tons short of the amount listed on the bills of lading and weight certificates.[3] Plaintiffs, alleging that they did not know whether the shortage was caused by Cook or the carrier, instituted one action against the carrier and a separate action against Cook. The carrier impleaded Cook and alleged that if there was a shortage it was due to Cook. The two actions were consolidated, and on February 20, 1976 the claims against the carrier and Cook were dismissed. Mr. Meeker commenced his association with Delson and Gordon on April 5, 1976 and was immediately assigned to this case in which the complaint was filed on May 3, 1976.[4]

## III. The Law

The law is clear that if the former action and the present action are "substan-

---

1. Delson and Gordon, on behalf of Government of India, brought similar actions in this Court against four other defendants as well. *The Government of India et al. v. Cargill Inc.,* 76 Civ. 1998; *The Government of India et al. v. Continental Grain Co.,* 76 Civ. 1999; *The Government of India et al. v. Peavey Co.,* 76 Civ. 2000; *The Government of India et al. v. Louis Dreyfus Corp.,* 76 Civ. 2002. A motion to consolidate these actions is pending before Judge Charles H. Tenney.

2. Although a partner was also assigned to these cases, from Mr. Meeker's description of what he himself did it is apparent that Mr. Meeker was in day-to-day charge of the cases. Moreover, no assertion is made to the contrary.

3. There was also a claim that some of the soybeans sustained water damage in transit, but that claim ultimately was not submitted to the Court.

4. On May 3, 1976, Mr. Meeker notified Mr. Reams, general counsel to Cook, that he was now associated with Delson and Gordon and was working on this suit. Mr. Reams did not object to Mr. Meeker's new firm prosecuting this case. However, since Fried, Frank, Harris, Shriver and Jacobson ("Fried, Frank"), and not Mr. Reams' firm, are attorneys of record for Cook in this case, Fried, Frank has an obligation to raise this issue so as to prevent any possible adverse consequences to its client. Accordingly, even if Mr. Reams' failure to ob-

tially related" and the attorney's involvement in the former case was more than peripheral,[5] then there is an irrebuttable presumption that the attorney had access to confidential information. *Silver Chrysler Plymouth v. Chrysler Motors Corp.,* 518 F.2d 751, 756–57 (2d Cir. 1975); see *The NCK Organization Ltd. v. Bregman,* 542 F.2d 128, 132–134 (2d Cir. 1976); Note, *The Second Circuit and Attorney Disqualification—Silver Chrysler Steers In A New Direction,* 44 Fordham L.Rev. 130 (1975). In other words, should the Court determine that there is a substantial relation between the two actions, then it will not require the movants to come forward with proof that Mr. Meeker had access to confidences,[6] nor will it give any weight to Mr. Meeker's vehement assertions that he did not have access to and does not now possess confidential information about Cook. See *T.C. Theatre Corp. v. Warner Bros. Pictures, Inc.,* 113 F.Supp. 265, 268–69 (S.D.N.Y. 1953); accord, *The NCK Organization Ltd.,* supra at 134–135; *Hull v. Celanese Corp.,* 513 F.2d 568, 572 (2d Cir. 1975); *Motor*

*Mart, Inc. v. Saab Motors, Inc.,* 359 F.Supp. 156, 157 (S.D.N.Y.1973). Furthermore, if a substantial relationship is established, the presumption of access to confidences prevails even though the "confidential" information may be publicly available. *The NCK Organization Ltd.,* supra at 133; *Emle Industries, Inc. v. Patentex, Inc.,* 478 F.2d 562, 572–73 (2d Cir. 1973); *United States v. Standard Oil Co.,* 136 F.Supp. 345, 348 (S.D. N.Y.1955). The rationale for this irrebuttable presumption is that to allow the litigants, attorneys and Court to become embroiled in a controversy over whether confidences have been reposed and whether the attorney is consciously or subconsciously making use of such confidences would thwart Canon 4's[7] ultimate objective of promoting an attorney-client relationship of trust and candor through preservation of clients' and former clients' confidences. *Emle Industries, Inc.,* supra at 570–71; *Standard Oil Co.,* supra at 355; *T.C. Theatre Corp.,* supra at 269.

■ The issue before this Court, then, is whether the former and present actions

ject to Mr. Meeker's association with this case were to be construed as a waiver, it would not preclude this Court's examination of the alleged conflict of interest. Cf. *Empire Linotype School, Inc. v. United States,* 143 F.Supp. 627, 631 (S.D.N.Y.1956) ("The Court's duty and power to regulate the conduct of attorneys practicing before it, in accordance with the Canons, cannot be defeated by the laches of a private party or complainant. Thus, the Court, on its own motion, may disqualify an attorney for violation of the Canons of Ethics.")

In addition, Delson and Gordon argue that the 2½-month delay between notification to Mr. Reams (May 3, 1976) and the return date of this motion (August 24, 1976) is unreasonable and worked a further hardship on Delson and Gordon which continued to prosecute this case diligently during that period. Although the Court recognizes the inconvenience, if not hardship, to Delson and Gordon, it does not impute Mr. Reams' knowledge to Fried, Frank. Rather, it finds that Fried, Frank first learned of the situation on July 19, 1976 and on July 21, 1976 requested Delson and Gordon to withdraw. On July 28, 1976, Delson and Gordon declined to withdraw, so on August 9, 1976, Fried, Frank filed this motion to disqualify, returnable August 24, 1976. The Court finds the delay entirely reasonable; therefore, there

has been no laches. See *Emle Industries, Inc. v. Patentex, Inc.,* 478 F.2d 562, 574 (2d Cir. 1973) (three-year delay is not unreasonable). Moreover, laches is normally not a defense to a motion to disqualify. *Emle, supra; Empire Linotype, supra.*

5. There can be no doubt that Mr. Meeker's involvement was more than peripheral since he conducted the defense of the Soybean Actions. See Note 2, supra. Thus, Mr. Meeker's role as an associate on the Soybean Actions is clearly distinguishable from the peripheral role of some "Wall Street" firm associates as described in *Silver Chrysler Plymouth v. Chrysler Motors Corp.,* 518 F.2d 751, 756–57 (2d Cir. 1975).

6. Accordingly, the Court declines to inspect Fried, Frank's in camera submissions which allegedly contain confidential information to which Mr. Meeker had or has access. But see *United States v. Standard Oil Co.,* 136 F.Supp. 345, 358–59 (S.D.N.Y.1955) (Kaufman, J.). See also *Consolidated Theatres, Inc. v. Warner Bros. Circuit Management Corp.,* 216 F.2d 920, 926 (2d Cir. 1954).

7. ABA Code of Professional Responsibility Canon 4 (1975).

against Cook are substantially related. To determine this

> the Court must ask whether it can reasonably be said that in the course of the former representation the attorney *might* have acquired information related to the subject of his subsequent representation. If so, then the relationship between the two matters is sufficiently close to bring the later representation within the prohibition of Canon [4].

*T.C. Theatre Corp. v. Warner Bros. Pictures, Inc., supra* at 269 (emphasis added). Thus, if Mr. Meeker might have acquired related information, then the matters are substantially related and he *and* Delson and Gordon must be disqualified. *Standard Oil Co., supra* at 350 n. 4, 360. *See also Laskey Bros. v. Warner Bros. Pictures, Inc.,* 224 F.2d 824, 826 (2d Cir. 1955).

A. *Are the Matters Substantially Related?*

Mr. Meeker and Delson and Gordon strenuously argue that although the instant action and the former actions are superficially similar inasmuch as they each relate to alleged shortages by Cook at its grain elevator in Reserve, Louisiana, "in reality" they are unrelated because, they claim, the alleged shortage in the Soybean Actions was never actively litigated; consequently, Mr. Meeker did not have occasion to investigate Cook's loading procedures or conduct anything more than minimal discovery. This argument addresses the critical issue. However, a thorough examination of the entire record in the Soybean Actions leads this Court to reject Mr. Meeker's assertion that all parties accepted the bills of lading and weight certificates as dispositive of the quantity of soybeans actually loaded onto the ship, obviating discovery.

(1) The issue of the validity and accuracy of the documents was impliedly raised by the complaint,[8] was clearly raised by the amended third-party complaint,[9] and was actively contested by plaintiffs and third-party plaintiff in opposing Cook's motion for summary judgment.[10] In addition, Mr.

---

**8.** Paragraph 7 of the complaint states:

Plaintiffs are unable to determine whether defendants or other defendants to be named in a companion civil action are responsible for the damage and shortage of said cargo.

**9.** Paragraph 18 of the Amended Third-Party Complaint states:

[I]f the plaintiffs' cargo suffered any loss or damage as alleged in the Complaint, which is denied, such loss or damage was occasioned solely by the failure of the third-party defendant, as shipper, its agents or servants, to furnish cargo of the quantity and weight specified in the bills of lading.

**10.** The plaintiffs' Statement Pursuant to Rule 9(g) states:

Plaintiffs herein contend that there is a genuine issue of fact as to the actual amount of cargo delivered by Cook Industries Inc. to the vessel "Norma" at Reserve, La., in January 1972.

The third-party plaintiff's Statement Pursuant to Rule 9(g) alleges that factual questions existed as to the quantity of soybeans loaded in the elevator, the quantity loaded on the vessel, and the quantity remaining in the elevator after the vessel was loaded. Additionally, counsel's accompanying affidavit states at 4–5:

[Mr. Meeker] . . . in paragraph 14 of his moving Affidavit [for summary judgment alleges] that "if any shortage was listed at outturn, it is . . . the fault of the carrier

for fraudulent bills of lading" . . . .. The reference to the so-called "fraudulent bills of lading" can only be interpreted in one manner, namely, that the bills of lading reflect a greater quantity thereon than actually loaded to the vessel.

In passing, it is to be noted that the quantity allegedly loaded to the vessel and reflected in the bill of lading was furnished by Cook . . . .. Any fraud which may be present originated, therefore, with Cook or its agents. Austin's stevedore merely loaded, stowed and trimmed the cargo; it did not weigh it.

Thus, in two (2) instances in his moving Affidavit, Cook's counsel alludes to the possibility that a quantity less than specified in the bills of lading could have been loaded to the vessel, and it is important to note that the grain in question was supplied by Cook to Bayside Elevator Co. at Reserve, Louisiana for loading (paragraph 9 of the Meeker Affidavit), but that no evidence of the quantity supplied or of the quantity remaining in the grain elevator on completion of loading attends the moving papers.

(some emphasis in original; some emphasis supplied).

Judge Stewart denied the summary judgment motion because the moving affidavits were not based on personal knowledge. He did not reach the question of whether there were any material issues of fact, but stated:

Meeker is clearly inaccurate in contending that the third-party plaintiff's answer to the Notice to Admit constituted an admission of the accuracy and validity of the documents. Request # 2 asked the third-party plaintiff to admit only "[t]hat the copies of the weight certificates . . . are true copies of such certificates." The response to that request was that "defendant and third-party plaintiff did not weigh the cargo in question and, while having received copies of the certificates . . . *can neither admit nor deny the accuracy of the contents of said certificates at this time.*" (Emphasis added). Request # 3 asked for an admission "[t]hat the copies of the loading invoices . . . are true copies of such invoices." Third-party plaintiff admitted that the invoices were rendered to S/S Norma *"but can neither admit nor deny the accuracy of the content of said invoices."* (Emphasis added). Request # 4 asked for an admission "[t]hat the copies of the bills of lading . . . are true copies of the originals. . . ." The third-party plaintiff denied that the exhibits were true and complete copies of the original bills of lading. Thus, it is clear that the accuracy and validity of the documentary evidence was not admitted.

It is true that plaintiffs and third-party plaintiff did not present any proof to rebut the documents offered by Mr. Meeker, and in this sense the issue was not actively contested. However, this does not change the fact that the validity and accuracy of the bills of lading and weight certificates had been an issue and Mr. Meeker had to be prepared to meet that issue, *i. e.,* he had to anticipate the proof his adversaries would

attempt to adduce. The fact that ultimately no evidence was adduced by his adversaries does not prove that Mr. Meeker did not investigate Cook's loading and weighing procedure to make sure that there was no merit to the allegation. Thus, the Court concludes that it is reasonable to assume that Mr. Meeker might have conducted at least a limited investigation into Cook's weighing and loading procedures and thus might have had access to confidential information.[11]

(2) Other than the documents themselves, the only evidence Mr. Meeker introduced on the issue of the accuracy and validity of the weights shown upon the documents was an affidavit of Mr. Willis, Chief Weighmaster of the Destrehan Board of Trade. The affidavit stated in part that Mr. Willis "personally supervised the weight certification . . . and can state that an official licensed weigher of Destrehan was at all times on hand to ensure the correctness of the weight certifications." The affidavit further states: "It is my *personal belief* that the weight certificates for soybean cargo loaded aboard the M. V. Norma . . . accurately reflect the true amount of grain loaded aboard that vessel." (Emphasis added). Thus, the Court notes, Mr. Meeker inexplicably chose to offer the Chief Weighmaster's "personal belief" rather than obtain an affidavit from Mr. Duffy, the licensed weigher who actually weighed the soybeans and signed the certificates. It is reasonable to assume that Mr. Meeker conducted some investigation or inquiry before deciding to obtain Mr. Willis', and not Mr. Duffy's, affidavit.[12]

*Since the primary issue in this case appears to be the weight of the soybeans when they were loaded onto the M/S Norma, the affidavits of Messrs. Meeker and Willis are not sufficient, since they were undoubtedly not present when the soybeans were weighed and loaded. (Emphasis added).*

**11.** In light of this conclusion, the Court finds no merit in Delson and Gordon's related argument that there is no substantial relationship because the Soybean Actions involved a run-of-the-mill breach of contract, a "routine cargo claim," whereas the present case involves allegations of wilful, fraudulent misconduct. This

argument misses the point; the issue is whether Mr. Meeker might have conducted an investigation which might have given him access to confidential information related to the present suit. As discussed above, the Court concludes that the normal course of preparation may have required him to conduct an investigation even though he was defending against breach of contract rather than fraud.

**12.** The Court notes in passing that the indictment to which Cook pleaded *nolo contendere* contains a schedule of alleged shortweighings. On that schedule, Mr. Duffy, the licensed

(3) In addition to the possibility that Mr. Meeker may have done some investigating, he also maintained contact with Mr. Reams, general counsel to Cook, and had occasion to speak with Mr. Reams' colleague, Mr. Ireland.[13] Mr. Meeker admits having consulted with Mr. Reams concerning his (Mr. Meeker's) intention to contact Mr. Willis (the Chief Weighmaster), and it is reasonable to assume that Mr. Meeker may have obtained other information from Mr. Reams and Mr. Ireland as well. For example, on September 26, 1973, Mr. Meeker wrote Mr. Reams: "We should greatly appreciate your putting us in touch with people from Cook at Reserve who might have records or recollections of the details of the loading so that we might investigate it further." Although Mr. Meeker has forgotten his having made this request and claims nothing came of it, the movants allege that handwritten notes in Hill, Rivkins' file indicate that Mr. Meeker did obtain the names of two Department of Agriculture employees and a Cook employee and obtained information from the latter.[14] Without reaching the question of whether or not Mr. Meeker conducted discovery of or actually communicated with Cook employees,[15] the Court finds that Mr. Meeker's contact with Mr. Reams, Cook's general counsel, and his colleague, Mr. Ireland, was equivalent to contact with Cook itself insofar as it provided a similar opportunity for access to confidential information.

(4) Lastly, Mr. Meeker claims that while at Hill, Rivkins he worked on about 1,000 cases and at any one time had about 350 cases to handle, most of which were cargo claims that were disposed of on the basis of documents. Although the Soybean Actions may have been two of hundreds of routine cargo claims handled by Mr. Meeker, in light of the foregoing discussion the Court cannot infer that there was no time or need for Mr. Meeker to investigate the claims in the Soybean Actions.

### B. Conclusion.

The Court is not unmindful that disqualification may affect Mr. Meeker's career opportunities. In addition, Delson and Gordon stand to lose substantial legal fees as a result of disqualification from this multimillion dollar action. Further, the Court recognizes that disqualification will cost the Government of India time and money by having to retain new counsel who will have to familiarize themselves with the months of investigation that allegedly have already been conducted. In addition, the Government of India, in being deprived of its right to select its own counsel, may lose the benefit of whatever specialized knowledge of its operations Delson and Gordon may have acquired over the years of its representation of its longtime client. Furthermore, this Court recognizes that disqualification motions are frequently made by defense

weigher who signed the weight certificates in the soybean cases, is listed as the licensed weigher of one of the alleged shortweighings enumerated in the indictment. Although the indictment was filed after the Soybean Actions were concluded, it is reasonable to assume that Mr. Meeker may have come by some information about Mr. Duffy that led him to decide to bypass this most appropriate witness. In this regard, the Court also notes that Mr. Meeker was aware of the "grain scandal" at least as early as July 1975 when he sent a message to obtain seven back issues of *The New York Times* containing front page stories on the grain scandal.

13. Mr. Meeker does not deny that he had contact with Mr. Ireland as alleged in Mr. Friedman's Reply Affidavit at ¶ 8.

14. Friedman's Reply Affidavit ¶¶ 12–14.

15. The Court does note, however, that Mr. Meeker billed Cook for "full pre-trial discovery and inspection" and for "conferring with counsel for Austin Navigation Corp., and requesting information as to the loading procedure at Reserve Port of Loading as well as the names of Cook's personnel at the loading port." Moreover, the record in the Soybean Actions indicates that the third-party plaintiff served Cook with a Notice of Examination Before Trial. There is no indication whether the examination took place, so the Court accepts Mr. Meeker's statement that "[t]he other parties to the litigation did not conduct any discovery of Cook although a notice to take Cook's deposition was served." However, the fact that the deposition did not occur does not prove that Mr. Meeker did not prepare himself and Cook for the deposition.

counsel for dilatory purposes only. Nonetheless, legal precedent clearly requires disqualification in this case. *Compare Emle Industries, Inc., supra; Motor Mart, Inc., supra.*

■ Prior cases have balanced the interests of the attorney, his new law firm, the present client, the former client and the public and have concluded that the balance must be drawn in favor of the former client's and public's interest in preservation of confidences and appearance of propriety. *Silver Chrysler, supra* at 757; *Hull v. Celanese Corp., supra* at 571; *Emle Industries, Inc., supra* at 565, 570–71, 575; *Motor Mart, Inc., supra* at 158; *Consolidated Theatres, Inc., supra* at 926; *Standard Oil Co., supra* at 364. *But see* Note, *The Second Circuit and Attorney Disqualification, supra* (after *Silver Chrysler,* courts should use the substantially related test rather than the broad appearance of impropriety test).

After considering all of the foregoing factors, this Court has determined to grant defendants' motion. Accordingly, Delson and Gordon and Frederick W. Meeker are disqualified. Plaintiffs are directed to designate substituted counsel within thirty days of the date of this decision.

It is so ordered.