[678 NYS2d 32]

Henry Kassis et al., Appellants, v Teacher's Insurance and Annuity Association et al., Respondents and Third-Party Plaintiffs-Respondents. Civetta/Cousins JV et al., Third-Party Defendants-Respondents.

First Department, June 16, 1998

APPEARANCES OF COUNSEL

*Dennis T. D'Antonio* of counsel (*Joshua L. Mallin* and *Eric Hatzimemos* on the brief; *Weg & Myers, P. C.,* attorneys), for appellants.

*Roula Theofanis* of counsel (*Thurm & Heller,* attorneys), for Teacher's Insurance and another, respondents and third-party plaintiffs-respondents.

*Joseph A. Oliva* of counsel (*Ahmuty, Demers & McManus,* attorneys), for D&F Masons, respondent and third-party defendant-respondent.

## OPINION OF THE COURT

SULLIVAN, J. P.

The IAS Court's denial of plaintiffs' motion to disqualify the law firm of Thurm & Heller, the attorneys for defendants and third-party plaintiffs, Teacher's Insurance and Annuity Association and Cauldwell-Wingate Company, Inc., should be affirmed. We are persuaded that disqualification is unnecessary, given the steps undertaken by Thurm & Heller, a firm comprised of 26 lawyers, 12 partners and 14 associates, to create a "Chinese Wall" around its associate, Charles Martin Arnold, a young lawyer one year out of law school, formerly employed by Weg & Myers, attorneys for the plaintiff Henry Kassis. Moreover, at this late stage of the litigation, the delay inherent in disqualifying Thurm & Heller, which has represented Teacher's and Cauldwell from the commencement of this action over five years ago, would be highly prejudicial to all of the parties except Kassis, whose interests in stalling the trial of this action, currently on the Trial Calendar, in order to comply with the IAS Court's discovery directives are served by disqualification and its attendant delay. All of the parties, except Kassis and his coplaintiff, North River Insurance Company, oppose disqualification.

The action is for property damage allegedly sustained by Kassis as a result of the construction of a building adjoining and in the vicinity of a building he owns at 141 E. 45th Street in New York City. Substituted as Kassis's counsel, Weg & Myers entered the case almost two years after its commencement. From the outset, Joshua Mallin, a Weg & Myers partner, was in charge of the case and conducted most of the discovery. Mr. Arnold, admitted to the Bar on January 31, 1996, was the associate who, under Mallin, undertook certain responsibilities in the Kassis matter. As Arnold describes it, he functioned as

Mallin's personal calendar clerk. While, as noted, Mallin conducted most of the depositions and personally determined the litigation strategy, Arnold participated in five depositions, four of which involved either nonparties (a property damage expert retained by the coplaintiff, North River, Kassis's subrogee, and a member of the structural engineering firm hired by Teacher's and Cauldwell before construction began) or other defendants (a defendant and third-party defendant and an employee of another defendant and third-party defendant). Preparation of these depositions would involve document review and inquiry of the witnesses as to their role and involvement in the matter giving rise to the claim. The fifth was the continued deposition of an employee of the coplaintiff, North River, which, on the basis of its experts' opinions clearly disputing Kassis's claims of damage, had initially denied the claim. Weg & Myers also represents North River. All that was required of Arnold to represent North River at the taking of its deposition was a review of its file, previously furnished in discovery. Thus, Arnold's involvement in the case was confined to specific assignments; he never read most of the documents within the file. As he states, he never had any independent authority in the case.

During a discussion in early February 1997, Arnold told Roula Theofanis, the partner in charge of this litigation for Thurm & Heller, that he was leaving Weg & Myers. Theofanis suggested that he fax his resume to Thurm & Heller, which, at the time, was interviewing associates with one to three years' experience. After an interview, Thurm & Heller hired Arnold, who began his employment as a junior associate on March 3, 1997. At both his interview and upon the commencement of his new employment, Arnold was instructed that he would not be permitted to touch the Kassis file or to discuss the matter with anyone at Thurm & Heller.

Earlier, by letter dated February 20, 1997, Mallin had written requesting that Thurm & Heller detail "the safeguards and precautions, i.e., the erection of a Chinese Wall, which your firm will institute to ensure that Mr. Arnold will have no contact * * * or involvement in the above-referenced litigation." By letter of February 27, 1997, Theofanis's response outlined the following precautions that Thurm & Heller would take to assure that Arnold was in no way involved in this matter:

"1. The entire file which presently consists of 15 redwells will be kept in my office in lieu of our general filing area.

"2. Mr. Arnold's office will be at a substantial distance from my office.

"3. Mr. Arnold upon commencement of his employment with the firm on March 3, 1997 will be instructed not to touch the Kassis file nor to discuss the Kassis matter with any partner, associate or staff member of the firm.

"4. There will be no meetings, conferences or discussions in the presence of Mr. Arnold concerning the Kassis' litigation.

"5. All future associates who may work on the Kassis matter with me in preparation for trial will be instructed not to discuss this file with Mr. Arnold."

In accordance with this advice, the entire Thurm & Heller file was moved from the general file area to Theofanis's office. Arnold was assigned an office, "almost an entire city block away," on a side of the building opposite Theofanis's office. When Mallin appeared at Thurm & Heller's office for a deposition, Theofanis showed him how the precautions in her February 27, 1997 letter were being implemented. At no time did Mallin voice any objection to the proposed safeguards or indicate that they were inadequate. Nor did he express any hesitation in proceeding with the scheduled deposition. Notwithstanding, Mallin, by order to show cause, moved on March 6, 1997 to disqualify Thurm & Heller. The IAS Court denied the motion, citing Arnold's limited involvement in the case, Mallin's failure to suggest any deficiencies in the precautions undertaken by Thurm & Heller (which the court found adequate to assure Arnold's noninvolvement in the case), and the prejudice to Teacher's and Cauldwell if Thurm & Heller were disqualified.

Disqualification of a lawyer or law firm representing a party will be granted where it is shown that a prior attorney-client relationship existed between the moving party and the attorney or law firm sought to be disqualified and that the former and current representation by the attorney or law firm are both adverse and substantially related. (*Solow v Grace & Co.*, 83 NY2d 303, 308.) The purpose of the rule is to protect client confidences and secrets and avoid the appearance of impropriety. (*Supra,* at 308-309; *see also, Cardinale v Golinello*, 43 NY2d 288.)

In *Solow*, however, the Court of Appeals also recognized that a per se disqualification rule in such circumstances would conflict with public policy in at least two respects, viz., it would impinge upon a client's right to be represented by counsel of his choice and restrict an attorney's ability to practice his or her profession. (83 NY2d, *supra,* at 310.) The Court also recognized that disqualification because of successive represen-

tations could present "significant hardships when the chosen attorney is disqualified." (*Supra,* at 310.) Furthermore, the Court noted, "[M]otions to disqualify are frequently used as an offensive tactic, inflicting hardship on the current client and delay upon the courts by forcing disqualification even though the client's attorney is ignorant of any confidences of the prior client. Such motions result in a loss of time and money, even if they are eventually denied.* * * [S]uch disqualification motions may be used frivolously as a litigation tactic when there is no real concern that a confidence has been abused." (*Supra,* at 310; *see, S & S Hotel Ventures Ltd. Partnership v 777 S. H. Corp.,* 69 NY2d 437, 443; *Saftler v Government Empls. Ins. Co.,* 95 AD2d 54, 60.)

We disagree with the dissent's characterization of Thurm & Heller as more analogous to the law firm involved in *Cardinale v Golinello* (43 NY2d 288, *supra*) than that involved in *Solow v Grace* (83 NY2d 303, *supra).* While Thurm & Heller has only 26 attorneys as compared to the 372-attorney Stroock firm in *Solow,* the hallmark of the law firm involved in *Cardinale*—its "informality," the " 'constant cross-pollination going on' and [the] 'cross current of discussion and ideas' among all attorneys on all matters which the firm handled" (*Cardinale v Golinello, supra,* at 292)—is, in light of the screening mechanisms, altogether absent here. Similarly, Thurm & Heller's screening mechanisms avoid *Cardinale's* problems of separate offices that are not physically isolated and a conference room and all firm files that are open and available to all lawyers. (*Supra.*)

Recognizing the competing interests raised by a motion to disqualify a law firm under circumstances similar to those present here, Federal courts have recognized that screening devices can be effective to protect client confidences. The challenged law firm must prove, *inter alia,* that the former client's confidences have not been shared with others at the law firm and that the firm has established screening mechanisms effectively to insulate against any future disclosure of confidences by the quarantined attorney to the firm. (*See, e.g., Manning v Waring, Cox, James, Sklar & Allen,* 849 F2d 222, 225-226 [6th Cir]; *see also,* Comment, *Federal Courts and Attorney Disqualification Motions: A Realistic Approach to Conflicts of Interest,* 62 Wash L Rev 863 [1987].)

The dissent, citing *Cheng v GAF Corp.*[1] (631 F2d 1052, 1058, *vacated on other grounds* 450 US 903), is concerned with the "continuing danger" that the disqualified attorney may unintentionally transmit information gained from the prior relationship. In our view, the carefully constructed safeguards employed by Thurm & Heller eliminate any such "danger". (*See, Cromley v Board Of Educ.*, 17 F3d 1059, 1065-1066 [7th Cir], *cert denied* 513 US 816.)

In the instant case, as noted, Thurm & Heller has represented Teacher's and Cauldwell for over five years in this litigation. The firm has engaged in an extensive investigation and conducted discovery. Theofanis, a Thurm & Heller partner, conducted the initial depositions of Kassis in 1993, prior to his retention of Weg & Myers on October 27, 1994. She has been the primary attorney responsible for the matter since approximately September 1995. She has also, in her handling of the case, which, from a file perspective, consists of 15 large redwell folders, investigated Kassis's past and present activities with a view towards impeaching his credibility.

In such circumstances, and in light of the implementation of a Chinese Wall, disqualification of Thurm & Heller would provide an undue advantage to Kassis. New counsel would face a daunting and time-consuming task in absorbing the extensive discovery and investigation that has been undertaken. Thus, a lengthy delay is a distinct prospect in this case, with which Thurm & Heller has lived for five years and which is now on the Trial Calendar. A substitution of counsel would also impose upon Teacher's and Cauldwell a significant financial hardship.

Moreover, absent from the record is any indication of a specific confidence that was disclosed to Arnold.[2] What the record does show is the extent of the precautions taken by Thurm & Heller on its hiring of Arnold to implement a Chinese Wall around him. He was instructed not to discuss the case with anyone. The Kassis files were to be inaccessible to him. His office was far removed from Theofanis's office, where the files

---

1. While, as the dissent notes, the firm in *Cheng* consisted of 35 attorneys, only 21 were employed in the same office as the tainted attorney.

2. While the dissent refers to Arnold's opportunity to "size up plaintiff himself, assess some vulnerabilities and perhaps plaintiff's personal style and goals and thereby assess what is substantive and what is bluster," these are not "client confidences" protected by the attorney-client privilege; the privilege extends only to communications made in professional confidence, not to everything the attorney learns in the course of his employment. (*See, People v Cook*, 82 Misc 2d 875, 876; 8 Wigmore, Evidence § 2311 [McNaughton rev 1961].)

would be maintained. In addition, Arnold has sworn that he has never discussed Kassis's case with anyone at Thurm & Heller. Furthermore, when, in response to Mallin's request that she indicate the safeguards that would be undertaken for "the erection of a Chinese wall", Theofanis, seven days later, detailed the protective measures that would be taken, Mallin offered no objection. Indeed, there is no explanation or suggestion as to why these measures are inadequate to isolate Arnold from the file and any discussion of the case in a firm consisting of 26 lawyers. In such circumstances, the motion to disqualify, which followed receipt of Theofanis's letter outlining the precautionary steps her firm would undertake to isolate Arnold from the case, was, for all that appears, an obvious litigation ploy calculated to give Kassis an unwarranted advantage.

Nor is there any reason to question the integrity of Arnold, who, as an officer of the court, has represented, under penalty of perjury, that no client confidences have been or would be disclosed. There is, of course, a similar presumption of integrity with respect to Theofanis's sworn statement regarding the steps Thurm & Heller have taken to assure that Arnold will have no involvement in this matter and her "unequivocal[ ] represent[ation] that * * * Arnold's employment at Thurm & Heller will in no way prejudice any party herein."

Accordingly, the order of the Supreme Court, New York County (Alfred Toker, J.H.O.), entered on or about April 17, 1997, denying the motion to disqualify Thurm & Heller, should be affirmed, without costs or disbursements.

TOM, J. (dissenting). The issue on this appeal is whether the law firm of Thurm & Heller should be disqualified as counsel to defendants because the firm hired an associate attorney who was actively representing the opposing party on the same matter in litigation.

Plaintiff Kassis commenced the underlying action in 1992 to recover for property damage incurred by his buildings during construction work performed by defendant Cauldwell-Wingate Company on an adjoining building owned by defendant Teacher's Insurance and Annuity Association. When the complaint was amended in 1994, Weg & Myers, P. C. represented plaintiff. Thurm & Heller, a 26-lawyer firm consisting of 12 partners and 14 associates, represented defendants Teacher's and Cauldwell.

The Weg & Myers partner who was assigned the file was Joshua Mallin. In or about February 1996, the file also was as-

signed to an associate, Charles Martin Arnold. The partner at Thurm & Heller who had been assigned the Kassis litigation for a year and a half before the disqualification motion was Roula Theofanis. She became acquainted with Arnold as an adversary during his handling of the Kassis case. During the Kassis litigation in early February 1997, Arnold indicated to Theofanis that he was looking for a position with another law firm. She knew that Thurm & Heller was in the process of interviewing associates in Arnold's class, and she suggested that he submit a resume. Arnold was interviewed by Thurm & Heller on February 5th, was offered employment on February 6th and accepted employment on February 10th, which commenced on March 3, 1997.

As an associate attorney of Weg & Myers, Arnold had worked on the Kassis lawsuit for a period of over one year. During that time, he conducted five depositions in connection with this litigation. Specifically, in the instant matter, Arnold participated in the deposition of coplaintiff North River Insurance Company on July 10, 1996; he conducted the deposition of defendant D&F Masons, Inc. on July 15, 1996; he conducted the deposition of defendant Atlantic Demolition Corporation on July 16, 1996; he conducted the deposition of a nonparty witness, Pierre L. Giani, on August 29, 1996; and he conducted the deposition of another nonparty witness, Armand Azak, on December 9, 1996. He also worked on written discovery, and personally met with plaintiff Kassis, with whom he had almost daily telephone conversations. In addition to conducting the five depositions, Arnold was present with Kassis at the physical inspection of the subject premises. Arnold also represented Kassis twice during mediation sessions conducted by a court-appointed mediator, in an attempt to resolve various issues in connection with this case. Furthermore, in an unrelated action involving Kassis, Arnold took six depositions.

By mid-February, Arnold had advised Weg & Myers of his change in employment. His prior involvement with the Kassis litigation raised a concern. Mallin, the partner assigned to the case, by letter dated February 20, 1997, asked Thurm & Heller to detail the steps it would take to implement an institutional screening mechanism to prohibit Arnold from having any involvement with the Kassis litigation. When Mallin appeared for a deposition on the Kassis litigation at Thurm & Heller's office on February 27th, Theofanis showed him that her office and Arnold's office would be widely separated; Mallin also was assured that the entire file of 15 redwells would be removed

from general file storage and placed in her office to guard against inadvertent contact with Arnold. That same day, Thurm & Heller wrote to Weg & Myers to commemorate these measures. Nevertheless, on March 6, 1997, Weg & Myers moved to disqualify Thurm & Heller from representing the defendants in this case.

In support of the motion, Weg & Myers noted Arnold's involvement with, and the amount of knowledge he possessed in, this specific case; Thurm & Heller's relatively small size; and the presumptive familiarity among its lawyers, and discussions regarding cases in general, that made disclosures concerning Kassis likely. In opposition, Arnold minimized his involvement with the Kassis matter. Thurm & Heller, in opposition, argued that retaining new counsel, which would have to familiarize itself with the entire case at such a late date, would significantly prejudice their clients and would only serve to delay trial.

The motion court denied plaintiff's motion for disqualification and noted Arnold's prior involvement with the case, but found that plaintiff had failed to demonstrate prejudice, especially since Arnold would be segregated from the case by a "Chinese Wall." The decision also noted that the case was five years old, that substituting counsel would prejudice defendants, that Ms. Theofanis had no need to consult with Arnold and that she had given assurances that she would not do so.

There are three issues in this case: did Arnold possess confidential information; if so, does the nature of the law firm make improper disclosure likely; and from the perspective of public policy, and that of the plaintiff, whether or not Arnold actually possessed confidential information, is there an appearance of impropriety?

A party seeking to disqualify an attorney or law firm must establish the existence of a prior attorney-client relationship, and that the former and current representations are both adverse and substantially related (*Cardinale v Golinello*, 43 NY2d 288). The rule has even been extended to nonlawyer employees of law firms (*Glover Bottled Gas Corp. v Circle M. Beverage Barn*, 129 AD2d 678 [paralegal, formerly employed by plaintiff's firm on litigation between the same parties, was basis to disqualify the defendant's firm which hired her]). New York has long recognized an irrebuttable presumption of shared confidences among attorneys employed by a firm that forecloses the firm from representing different, adversarial, clients in substantially related matters (*Cardinale v Golinello*,

*supra*; *Aversa v Taubes*, 194 AD2d 579). Since ethical constraints apply equally to all lawyers in a firm, if one attorney in the firm is disqualified from representing a client, then all attorneys in the firm are disqualified. This is so because of the irrebuttable proscription of shared confidences that is presumed to exist in law firms.

The purpose of the rule is three-fold. First is the concern for protecting client confidences, and especially to avoid disclosure or adverse use of information in connection with the vigorous representation of the current client (*Solow v Grace & Co.*, 83 NY2d 303, 309, and citations therein). Second, the rule avoids the appearance of impropriety on the part of the attorney as well as the firm. A presumption of disqualification avoids the need for a hearing into whether there is an actual conflict. New York favors disqualification over a hearing because the hearing itself may cause disclosure of the very information that it seeks to protect (*supra*; *cf.*, *Lightning Park v Wise Lerman & Katz*, 197 AD2d 52 [if disqualification motion cannot be resolved on papers, hearing may be necessary]). Third, the rule is clear, easy to apply and contemplates self-enforcement among members of the Bar (*Solow v Grace & Co.*, *supra*). Since a lawyer is obliged to avoid even the appearance of impropriety, and in view of the fiduciary relationship that may still bind the lawyer to the adverse litigant, any question should be decided in favor of disqualification (*cf.*, *Saftler v Government Empls. Ins. Co.*, 95 AD2d 54, 60 [Milonas, J., dissenting]).

Although Arnold and defendants' law firm attempt to minimize Arnold's involvement in the Kassis matter while he was employed by Weg & Myers, " 'it is no answer that the lawyer did not in fact obtain any confidential information in connection with the first employment, or even that it was only other members of the firm who rendered the services to the client' * * * the former client need only show a reasonable probability that confidential information will be disclosed" that may be "apparent from the situation itself" (*Flaum v Birnbaum*, 107 AD2d 1087, 1088). In any event, the argument is unavailing. It is undisputed that he handled five depositions, that included party depositions; he attended the physical examination of the premises with Kassis; and he attended two court mediation sessions. Clearly, in order to be prepared for depositions, and court and mediation appearances, Arnold had to have reviewed the Kassis file and familiarized himself with the different aspects of the Kassis action. Arnold does not deny having had access to the Kassis file; rather, he contends that he "never

read the overwhelming majority of documents contained in the file." Thus, while he claims that he never read the entire file consisting of approximately 15 redwells, he did have access to, and presumably did read sufficient portions of the file to familiarize himself with the case.

Plaintiff described Arnold as his "voice" to Mallin when Mallin was unavailable, and contends that Arnold actually was plaintiff's sole contact with the firm on the many occasions when Mallin was away from the office on business. Plaintiff avers that he had discussed the case with Arnold regularly, telephoning him almost daily for periods of time, and that he had discussed his own deposition with Arnold. Plaintiff describes the discussions as including strategies in general, but also strategies for deposing other witnesses, and settlement strategies in connection with various parties. Plaintiff expresses the founded concern that he had conveyed confidential information to Arnold, and that Arnold must know his thought processes with respect to this case.

These allegations are not directly refuted by Arnold. It is not overly speculative to conclude that, at the least, Arnold had ample opportunity to size up plaintiff himself, assess some legal vulnerabilities and perhaps plaintiff's personal style and goals and thereby assess what is substantive and what is bluster as plaintiff personally walks through this litigation. Just as important, Arnold likely became aware of Mallin's professional conclusions about the strengths and weaknesses of the case.

The totality of circumstances makes clear that Arnold was privy to confidential information directly related to the Kassis litigation.

The circumstances of this case also increase the likelihood of disclosure. The Court of Appeals in *Solow* (*supra*) held that in instances where large, departmentalized law firms are involved, the presumption of shared confidences may be rebutted, so as to allow the firm to continue its representation of the client after an analysis of the nature of the prior representation is made and upon a showing by the law firm that there is no reasonable possibility that any of its other attorneys acquired confidential information concerning the client (*Solow v Grace & Co., supra,* at 313). The smaller and more informal the setting, the more necessary it becomes to protect the client and avoid the appearance of impropriety by deeming the information to be imputed as a matter of law. Conversely, the larger the firm, the more onerous the rule becomes, especially if per

se application results in all members of the firm being disqualified indiscriminately whether or not they had knowledge of a former client's confidences, which ends up creating hardships for many current clients.

Although the majority relies on *Solow* to articulate the need for flexibility in application of the disqualification rule, the differences with the case at bar are manifest in almost every regard. By contrast with *Solow*, the law firm involved in the present case, as in *Cardinale (supra)*, is a small firm with 26 lawyers whose activities and interrelationships are presumptively informal; in *Solow*, the law firm had 372 attorneys segregated in different departments. Although measures in the current case are intended to isolate files and Arnold with respect to the Kassis litigation, nevertheless the basic point remains: the size of a small firm enhances the likelihood—and the associated appearance—that a collegial exchange of information, in which attorneys seek one another out with ease to share ideas about how to handle client matters, will lead to improper disclosures. Similar reasoning has been employed elsewhere in rejecting a "Chinese Wall" defense, that in a 35-attorney firm, even instituting formalities intended to segregate a new attorney from litigation with which he was familiar does not prevent the continuing danger that he may unintentionally transmit information gained from the prior relationship (*Cheng v GAF Corp.*, 631 F2d 1052, 1058, *vacated on other grounds* 450 US 903; *Baird v Hilton Hotel Corp.*, 771 F Supp 24). *Solow* noted the continuing vitality of the *Cardinale* principle that "the duty of loyalty * * * and the avoidance of even an appearance of impropriety are so important that any harm associated with disqualification was minimal when compared with furthering these goals" (*Solow v Grace & Co.*, at 312).

As was said in *Cardinale (supra)*, the possibility is too great that an attorney in a small firm either wittingly or unwittingly may acquire confidential information about the particular client, a likelihood not lessened even if the attorney does not personally represent the adversary. As also was said in *Solow*, a factual setting such as that present here might well lead laypersons to believe that the attorney was "hired not only because of his legal talent, but also because of confidential information that he possessed" (*Solow v Grace & Co., supra*, at 311). Federal courts have made the similar point under analogous circumstances that the former client or members of the public would consider the attempted quarantine to be inadequate especially when the attorney had a prior personal con-

nection with the former client (*Baird v Hilton Hotel Corp.*, 771 F Supp 24, *supra*) and, in this case, the Thurm & Heller partner responsible for the Kassis litigation is the very attorney who had brought Arnold to the Thurm & Heller firm during the pendency of this litigation. The facts in this case unquestionably create a clear appearance of impropriety.

The majority is concerned with plaintiff's motive and the advantages that he may secure vis-à-vis these defendants as a result of disqualification. The majority focuses on the issue of actual conflict—finding none—without, however, giving sufficient consideration to the separate issue of whether there is an appearance of impropriety. The majority has concluded that this record indicates that the motion to disqualify was only an obvious litigation ploy calculated to give plaintiff an unwarranted advantage. The record clearly does not support this conclusion. It should be noted that Thurm & Heller created this situation for themselves when they hired Arnold while this matter was still in the process of being litigated, knowing that he had worked on this case for plaintiff's counsel. The majority's concerns, which do not find support in the record, still must yield to the more important consideration that unmitigable impropriety appears to be inherent in the entangled relationships in this case. In ethical matters, " ' "we cannot paint with broad strokes. The lines are fine and must be so marked" ' " (*Board of Educ. v Nyquist*, 590 F2d 1241, 1246, quoting *Fund of Funds v Andersen & Co.*, 567 F2d 225, 227, quoting *United States v Standard Oil Co.*, 136 F Supp 345, 367).

The motion to disqualify very quickly followed the change in Arnold's employment giving rise to the purported conflict (*compare, Matter of Prudential Sec. v Wyser-Pratte*, 187 AD2d 306 [motion to disqualify filed only on eve of proceedings; record supported inference that motion was made solely to secure tactical advantage]). Plaintiffs, immediately upon learning of Arnold's acceptance of employment with Thurm & Heller, wrote on February 20, 1997 to the firm concerning the potential conflict of interest. Arnold then commenced employment with Thurm & Heller on March 3, 1997 and plaintiffs moved to disqualify on March 6, 1997. In this sense, the record does not support the majority's concern that the motion was only a belated pretrial strategy designed to place defendants at a disadvantage and to delay trial. The majority is concerned that the case is now on the Trial Calendar; however, it was not in that posture when the motion to disqualify was made more

than a year ago. The majority also contends that Mallin failed to object when he was informed of the proposed protective measures, but a motion to disqualify a few days later, if nothing else, promptly articulates protest over the questionable effectiveness of segregating the new junior associate within the confines of a relatively small firm.

Hence, I respectfully differ from the majority as to the likelihood of Arnold's actual possession of confidential information; the nature of the law firm, increasing the likelihood of disclosure; and the significant likelihood that these facts depict impropriety to plaintiff as well as the public. Any of these factors would persuade me of the necessity of disqualification; considered in the aggregate, I believe that conclusion to be compelled.

The order denying plaintiff's motion to disqualify the law firm of Thurm & Heller from representing defendants Teacher's and Cauldwell should be reversed and disqualification should be granted.

MILONAS and WALLACH, JJ., concur with SULLIVAN, J. P.; WILLIAMS and TOM, JJ., dissent in a separate opinion by TOM, J.

Order, Supreme Court, New York County, entered on or about April 17, 1997, affirmed, without costs or disbursements.